Timothy S. Trecek (SBN 1021161)
Habush Habush & Rottier SC®
777 E. Wisconsin Avenue
Suite 2300
Milwaukee, WI 53202
Phone: 414-271-0900
Fax: 414-271-6854
ttrecek@habush.com

Lynn Lincoln Sarko (SBN 1010823)
Michael D. Woerner (SBN WA/15452)
Tana Lin (SBN WA/35271)
KELLER ROHRBACK L.L.P.
1201 Third Avenue, Suite 3200
Seattle, WA 98101
Tel:  (206) 623-1900
Fax:  (206) 623-3384
lsarko@kellerrohrback.com
mwoerner@kellerrohrback.com
tlin@kellerrohrback.com

***Attorneys for Plaintiff***
[Additional Counsel Listed on Signature Page]

# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF WISCONSIN (MILWAUKEE)

| | | |
|---|---|---|
| EDWIN L. RESO, for the use and benefit of THE ARTISAN INTERNATIONAL FUND, THE ARTISAN INTERNATIONAL VALUE FUND, and THE ARTISAN MID CAP VALUE FUND, | ) ) ) ) ) | Case No. 2:11-cv-00873-JPS |
| Plaintiff, | ) ) | **PLAINTIFF'S OPPOSITION TO DEFENDANT'S MOTION TO DISMISS** |
| v. | ) ) | |
| ARTISAN PARTNERS LIMITED PARTNERSHIP, | ) ) ) | |
| Defendant. | ) | |

# TABLE OF CONTENTS

I. PLAINTIFF'S SUMMARY OF ARGUMENT.................................................. 1

II. STATEMENT OF RELEVANT FACTS .................................................... 1

    A. Background on Mutual Funds and the Investment Company Act ...................... 1

    B. Facts Establishing Defendant's Breach of Fiduciary Duty .......................... 2

III. ARGUMENT ............................................................................. 8

    A. Defendant Advocates an Inappropriate and Impossible Pleading Standard. ......................................................................... 8

    B. Plaintiff's Allegations Sufficiently State a Claim Under § 36(b) of the ICA. ............................................................................. 14

        1. The Standard of Liability Under § 36(b) .............................. 14

        2. The *Gartenberg* Factors ................................................. 15

            a. The Nature and Quality of Services ........................... 17

            b. Comparative Fee Structures .................................... 20

            c. Economies of Scale ............................................. 24

            d. The Profitability of the Fund to the Adviser ................. 27

            e. The Independence and Conscientiousness of the Directors ....................................................... 28

    C. Defendant Ignores Relevant Cases and Relies on Inapposite Cases.................. 30

IV. CONCLUSION .......................................................................... 34

# TABLE OF AUTHORITIES

## Federal Cases

*Amron v. Morgan Stanley Inv. Advisors Inc.*, 464 F.3d 338 (2d Cir. 2006) ........................ 28, 29

*AnchorBank, FSB v. Hofer*, 649 F.3d 610 (7th Cir. 2011) .................................... 9, 10

*Arista Records LLC v. Doe 3*, 604 F.3d 110 (2d Cir. 2010) ...................................... 10

*Ashcroft v. Iqbal*, 129 S. Ct. 1937 (2009) ............................................................... 8, 9

*Bausch v. Stryker Corp.*, 630 F.3d 546 (7th Cir. 2010) ..................................... passim

*Bell Atl. Corp. v. Twombly*, 550 U.S. 544 (2007) ..................................... 7, 8, 10, 21

*Bissessur v. Ind. Univ. Bd. of Trs.*, 581 F.3d 599 (7th Cir. 2009)........................ 10, 15, 20, 22

*Braden v. Wal-Mart Stores, Inc.*, 588 F.3d 585 (8th Cir. 2009) ......................... passim

*Burks v. Lasker*, 441 U.S. 471 (1979) ....................................................................... 26

*Curran v. Principal Mgmt. Corp., LLC.*, No. 09-0433, 2010 WL 2889752 (S.D. Iowa June 8, 2010), *vacated in part on other grounds*, 2011 WL 223872 (S.D. Iowa Jan. 24, 2011) ................................................................... 6, 14, 27, 28

*Daily Income Fund, Inc. v. Fox*, 464 U.S. 523 (1984)....................................... 1, 2, 11

*Dumond v. Mass. Fin. Servs. Co.*, No. 04-11458, 2006 WL 149038 (D. Mass. Jan. 19, 2006) ........................................................................................................ 27

*Erickson v. Pardus*, 551 U.S. 89 (2007) ..................................................................... 9

*Gallus v. Am. Express Fin. Corp.*, 370 F. Supp. 2d 862 (D. Minn. 2005).................. 27

*Gallus v. Ameriprise Fin., Inc.*, 561 F.3d 816 (8th Cir. 2009), *vacated*, 130 S. Ct. 2340 (2010) ..................................................................................... 20, 21, 26

*Gartenberg v. Merrill Lynch Asset Mgmt., Inc.*, 694 F.2d 923 (2d Cir. 1982) ......... 13, 14, 17, 18

*Hoffman v. UBS-AG*, 591 F. Supp. 2d 522 (S.D.N.Y. 2008)....................................... 29

*Hunt v. Invesco Funds Grp, Inc.*, No. 04-2555, 2006 WL 1581846 (S.D. Tex. June 5, 2006) .......................................................................................................... 27

*In re Am. Mut. Funds Fee Litig.*, No. 04-5593, 2009 WL 5215755 (C.D. Cal. Dec. 28, 2009) .......................................................................................................... 26

*In re Federated Mut. Funds Excessive Fee Litig.*, No. 04-352, 2009 WL 5821045
(W.D. Pa. Sept. 30. 2009) ............................................................................... 16, 18, 27, 28

*In re Goldman Sachs Mut. Funds Fee Litig.*, No. 04-2567, 2006 WL 126772
(S.D.N.Y. Jan. 17, 2006)............................................................................................... 14

*In re Medtronic, Inc., Sprint Fidelis Leads Prods. Liab. Litig.*, 623 F.3d 1200 (8th
Cir. 2010) ...................................................................................................................... 11, 12

*In re Salomon Smith Barney Mut. Fund Fees Litig.*, 528 F. Supp. 2d 332
(S.D.N.Y. 2007), *rev'd in part on other grounds sub nom R.W. Grand Lodge
of F. & A.M. of Pa. v. Salomon Bros. All Cap Value Fund,* No. 08-0038, 2011
WL 2268551 (2d Cir. June 9, 2011) ........................................................................ 16, 17, 29

*Jones v. Harris Assocs. L.P.*, 130 S. Ct. 1418 (2010)..........................................................passim

*Jones v. Harris Assocs. L.P.*, 537 F.3d 728 (7th Cir. 2008) ....................................................... 20

*Jones v. Harris Assocs. L.P.*, No. 04-8305, 2005 WL 831301 (N.D. Ill. Apr. 7,
2005) .................................................................................................................................... 27

*Krantz v. Fid. Mgmt. & Research Co.*, 98 F. Supp. 2d 150 (D. Mass. 2000)........... 17, 22, 25, 26

*Michael v. Letchinger*, No. 10-3897, 2011 WL 3471082 (N.D. Ill. Aug. 5, 2011).................... 11

*Migdal v. Rowe Price-Fleming Int'l, Inc.*, 248 F.3d 321 (4th Cir. 2001)................................... 24

*Ocasio-Hernández v. Fortuño-Burset*, 640 F.3d 1 (1st Cir. 2011)......................................... 8, 16

*Pepper v. Litton*, 308 U.S. 295 (1939)............................................................................... 6, 12, 13

*Reynolds v. CB Sports Bar, Inc.*, 623 F.3d 1143 (7th Cir. 2010)................................................. 9

*Sins v. Janus Capital Mgmt., LLC*, No. 04-1647, 2006 WL 3746130 (D. Colo.
Dec. 15, 2006) ..................................................................................................................... 27

*Smith v. Med. Benefit Adm'rs Grp., Inc.*, 639 F.3d 277 (7th Cir. 2011)............................... 9, 10

*Starr v. Baca*, --- F.3d. ----, 2011 WL 2988827 (9th Cir. July 25, 2011) ................. 9, 15, 20, 22

*Strigliabotti v. Franklin Res. Inc.*, No. 04-0883, 2005 WL 645529 (N.D. Cal. Mar.
7, 2005) ................................................................................................................................ 27

*United States ex rel. Lusby v. Rolls-Royce Corp.*, 570 F.3d 849 (7th Cir. 2009) ...................... 10

*White v. Marshall & Isley*, No. 10-311, 2011 WL 2471736 (E.D. Wis. June 21,
2011) .................................................................................................................................... 18

*Wicks v. Putnam Inv. Mgmt., LLC*, No. 04-10988, 2005 WL 705360 (D. Mass. Mar. 28, 2005)..................................................................................................... 14

## State Cases

*Orman v. Cullman*, 794 A.2d 5 (Del. Ch. 2002)........................................................ 26

## Federal Statutes

Investment Company Act of 1940 § 36(b), 15 U.S.C. § 80a-l et seq. ("ICA") .................. passim

## Federal Rules

Fed. R. Civ. P. 8(a) ................................................................................................. 7

## Other Authorities

5 CHARLES ALAN WRIGHT & ARTHUR R. MILLER, FEDERAL PRACTICE & PROCEDURE § 1224 (3d ed. 2004)......................................................................... 11

S. Rep. No. 91-184 (1969), *reprinted in* 1970 U.S.C.C.A.N. 4897............................................. 2

# I.    PLAINTIFF'S SUMMARY OF ARGUMENT

Edwin L. Reso respectfully submits that the Court should deny Defendant's motion to dismiss because, contrary to Supreme Court and Seventh Circuit case law, Defendant seeks to hold Plaintiff to a heightened fact-pleading standard, to draw inferences *against* Plaintiff, and to resolve disputed questions of fact in Defendant's favor.  In short, Defendant would require Plaintiff to *prove* his claim rather than *plead* it.  But the applicable standard requires Plaintiff only to allege enough factual matter to plausibly state a claim for relief.

Plaintiff's detailed Complaint plausibly demonstrates that Defendant has violated § 36(b) of the Investment Company Act of 1940, 15 U.S.C. § 80a-l et seq. ("ICA"), by charging the Artisan International Fund, the Artisan International Value Fund, and the Artisan Mid Cap Value Fund ("Funds") excessive investment advisory fees and allows the Court to draw the reasonable inference that Plaintiff is entitled to relief.  At least eight other courts have denied motions to dismiss similar complaints, including two within the past two years.  *See* Part III.C., *infra*. Defendant fails to mention these cases, instead relying on inapposite cases that dismissed complaints bearing little resemblance to Plaintiff's Complaint.

The Court should decline Defendant's invitation to apply an inappropriate and impossible-to-meet pleading standard and deny Defendant's motion to dismiss.

# II.    STATEMENT OF RELEVANT FACTS

## A.    Background on Mutual Funds and the Investment Company Act

A mutual fund is typically created and managed by its investment adviser, who supervises the daily operations of the fund and often selects its board of directors.  *Daily Income Fund, Inc. v. Fox*, 464 U.S. 523, 536 (1984) (citation omitted).  For this reason, the relationship between a fund and its adviser is "'fraught with potential conflicts of interest.'"  *Id.* (citation

omitted). Mindful of these potential conflicts, Congress enacted the Investment Company Act of 1940 to regulate and curb the "'abuse inherent in the structure of [mutual funds],'" *Jones v. Harris Assocs. L.P.*, 130 S. Ct. 1418, 1422 (2010) (quoting *Daily Income*, 464 U.S. at 536), and to create standards of care applicable to investment advisers.

Despite the passage of the ICA, investment advisers continued exploiting their mutual funds by charging them excessive fees. Recognizing that "the forces of arms-length bargaining [over compensation] do not work in the mutual fund industry in the same manner as they do in other sectors of the American economy," S. Rep. No. 91-184, at 4 (1969), *reprinted in* 1970 U.S.C.C.A.N. 4897, 4901, Congress amended the ICA. In adding § 36(b), Congress intended for private shareholders to protect the interests of their fellow investors by acting as an "independent check[] on excessive fees." *Daily Income*, 464 U.S. at 541.

**B.      Facts Establishing Defendant's Breach of Fiduciary Duty**

Despite Defendant's suggestions otherwise, Plaintiff's allegations include much more than mere legal conclusions or bare recitations of the elements of a § 36(b) claim. From the limited public information regarding Defendant's operations, Plaintiff has alleged numerous specific facts the Court must accept as true, drawing all reasonable inferences in Plaintiff's favor.

Pursuant to written agreements, Defendant provides investment advisory services to each of the Funds for a fee based on a percentage of each Fund's assets. Compl. ¶¶ 8, 31-32. These fees are not based on the services actually rendered or Defendant's actual costs in providing the services. *Id*. at ¶ 32. While Defendant furnishes office space, equipment, and personnel to manage the business of the Funds and assumes some expenses incurred in managing the Funds, these services are *de minimis*, entailing no significant costs to Defendant. *Id*. at ¶¶ 34-35. Rather, the <u>Funds themselves</u> pay *separately* for the other substantial services they require,

including custodial services, transfer agency services, legal services, accounting services, registration fees, broker commissions, shareholder communications, and the board of directors expenses. *Id.* at ¶ 34.

Defendant provides essentially the same investment advisory services to its other clients. *Id.* at ¶¶ 53, 55-57. Indeed, other accounts with the same investment strategies as the Funds share the same portfolio managers and top holdings, *id.* at ¶ 57, and Defendant admits in public filings that: "client accounts within each strategy, including the Funds' accounts are managed similarly, [and] substantially all of the research and portfolio management activities conducted by the investment teams benefit all clients within the particular strategy." *Id.* (quoting Artisan Funds, Inc., Statement of Additional Information 34 (Jan. 28, 2011, as supplemented May 26, 2011)). Moreover, any additional services Defendant provides to the Funds are either paid for separately or are de minimis. *Id.* at ¶¶ 35, 55, 57.

Yet, Defendant charges the Funds, to whom it owes a fiduciary duty, dramatically higher fees even though it provides essentially the same investment advisory services to the Funds and its other clients who bargain at arm's length. *Id.* at ¶¶ 58, 61. For example, Defendant charges the Funds a fee rate that is nearly ten times the rate it charged the California Public Employees' Retirement System and almost double the rate it charges the Clearwater International Fund and the Wells Fargo Advantage Diversified International Fund. *Id.* at ¶¶ 61-62. If the Artisan International Fund benefited from a rate similar to Defendant's other clients who bargain at arm's length, it would save between $32 million and $63 million in fees annually. *Id.* at ¶62.

Furthermore, all of the Funds have much higher investment advisory fees than similarly sized, actively managed Vanguard funds that receive comparable services. *Id.* at ¶¶ 66-67. Because the Vanguard funds negotiate their fees at arm's length with independent, for-profit

advisers, these fees represent market-based rates. *Id*. at ¶ 66. The Artisan Funds pay rates that are four or more times these arm's-length rates. *Id*. at ¶ 67. If the Funds paid the same rates as the actively managed Vanguard Funds, they each would save between $30 million and $54 million in fees annually. *Id*. at ¶ 68.

Finally, the Artisan International Fund's fees are high even by industry standards. *Id*. at ¶ 64. The Artisan International Fund's expense ratio ranks in the highest 40% of similar funds. *Id*. at ¶ 65. Accordingly, Morningstar assigned the Fund a Grade of "F" for its fees. *Id*. at ¶ 36.

As the Funds have grown, Defendant has realized significant economies of scale because the work required to operate a mutual fund does not increase proportionately with a fund's assets: the investment advisory services for a ten billion dollar fund are essentially the same as those for a one billion dollar fund, or even a one million dollar fund, generating enormous economies of scale. *Id*. at ¶¶ 69, 71. The SEC, the Governmental Accounting Office, and academic research have determined that economies of scale are not being passed along to mutual fund shareholders. *Id*. at ¶¶ 72-74.

The economies of scale realized by Defendant in providing investment advisory services to the Funds have been misappropriated by Defendant, resulting in excessive profits for it. *Id*. at ¶ 75. For example, while the Funds have grown over time, the fee schedules for the Funds, with one minor exception, have not changed since their inception. *Id*. at ¶ 48. Further, although the Funds' fee schedules contain breakpoints,[1] the breakpoints are very slight compared to those for Defendant's clients who bargain at arm's length. *Id*. at ¶ 76. For example, the fee schedule for the Clearwater International Fund drops 20 basis points (from 0.80% to 0.60%) at $50 million in

---

[1] Breakpoints are reductions in the fee rate as the fund reaches certain asset levels. A fee schedule can contain multiple breakpoints.

assets and another 10 basis points (to 0.50%) at $100 million in assets. *Id*. at ¶ 61.b. In contrast, the first drop in the fee schedule for the Artisan International Fund is only 2.5 basis points (from 1.00% to 0.975%) and does not occur until the Fund reaches $500 million in assets, with additional drops of only 2.5 bps at $750 million, $1 billion, and $12 billion. *Id*. at ¶ 33. To put this in perspective, the Clearwater International Fund's fee rate drops nearly 40% (from 0.80% to 0.50%) over the course of reaching $100 million in assets, but the Artisan International Fund's rate drops only 10% (from 1.00% to 0.90%) over the course of reaching $12 *billion* in assets. This discrepancy exists even though both clients receive essentially the same investment advisory services, *id*. at ¶¶ 55- 61, and clearly indicates Defendant's failure to meaningfully share economies of scale with the shareholders of the Funds. *Id*. at ¶¶ 75-77. With the Clearwater breakpoints, the Funds would save $32 million annually. *Id*. at ¶ 62.

Defendant's discriminatory pricing and failure to meaningfully share economies of scale with the Funds also has led to excessive profits. *Id*. at ¶¶ 75, 82. By way of illustration, even though the Artisan complex of mutual funds has accounted for just slightly more than half of Defendant's assets under management over the past three years, those funds have accounted for more than two-thirds of Defendant's revenues, and Defendant has generated a profit margin on the funds that is approximately double the profit margin it has generated on its other clients. *Id*. at ¶ 82.

In addition to the foregoing facts that plausibly demonstrate the excessiveness of the Funds' investment advisory fees, Plaintiff has alleged facts establishing that the process by which these fees were approved was deficient,[2] which also reflect on the independence and

_____

[2] Defendant wrongly suggests that Plaintiff's Complaint is partly based on the premise that a § 36(b) claim may lie for process-only violations of Defendant's fiduciary duty. Def's Mot. 7.

conscientiousness of the directors. The fee-approval review process is a vitally important part of the analysis of § 36(b) liability under *Jones*. As the Supreme Court explained, where the process 'was deficient or the adviser withheld important information, the court must take a more rigorous look at the outcome." *Jones*, 130 S. Ct. at 1430. This review is necessarily a fact-intensive inquiry that cannot be resolved on a motion to dismiss, particularly given that information related to the fee-approval process is exclusively in the adviser's possession and control. *See* Compl. ¶ 45 (alleging that all of the information provided to the directors is packaged and presented by Defendant). *See also Curran v. Principal Mgmt. Corp., LLC.*, No. 09-0433, 2010 WL 2889752, at *9 (S.D. Iowa June 8, 2010), *vacated in part on other grounds*, 2011 WL 223872 (S.D. Iowa Jan. 24, 2011) (noting that the defendants' arguments raised fact-intensive inquiries suggesting that resolution of the § 36(b) claim was unlikely even at the summary judgment stage of litigation).

Despite dramatic growth in the assets of the Funds and the addition of new funds to the Artisan complex over the years, the fee schedules for the Funds, with one minor exception, have not changed since their inception. *Id*. at ¶ 48. Specifically, none of the fee schedules for the Funds contain any breakpoints after $1 billion in assets except the schedule for the Artisan International Fund, which has a slight additional breakpoint at $12 billion in assets. *Id*. This remains true even though each of the Funds is well past $1 billion in assets, and the Artisan

---

Although Plaintiff does maintain that *Jones* allows such claims—*Jones* explicitly adopted *Pepper v. Litton*'s concept of fiduciary duty, which requires both a fair process and a fair outcome, *see Jones*, 130 S. Ct. at 1427 (quoting *Pepper v. Litton*, 308 U.S. 295, 306-07 (1939))—the Court need not reach that question for purposes of Defendant's motion to dismiss. Even without Plaintiff's allegations regarding Defendant's deficient fee-approval process, Plaintiff's Complaint plausibly demonstrates the excessiveness of Defendant's fee and, therefore, survives Defendant's motion to dismiss regardless of how this Court interprets *Jones*. At the very least, however, Plaintiff's allegations regarding the process require the Court to "take a more rigorous look at the outcome." *Jones*, 130 S. Ct. at 1430.

International Fund has been past $12 billion in assets. *Id*. These facts support a plausible claim that the directors have not adequately reviewed and negotiated the fees as required by the Supreme Court in *Jones*.

These facts also support Plaintiff's allegations that Defendant does not provide the directors with sufficient, complete, or accurate information and has, in fact, made misleading representations to the directors. *Id*. at ¶¶ 45-47. In particular, Plaintiff alleges that Defendant has made misleading representations regarding (1) the services it provides and advisory fees it charges its other clients, (2) the economies of scale it realizes, and (3) and Defendant's profitability. *Id*. at ¶¶ 46-47. Plaintiff further alleges that Defendant employs inaccurate accounting practices in its financial reporting, including arbitrary and unreasonable cost allocations, which obfuscate Defendant's true profitability and mask economies of scale. *Id*. at ¶¶ 46, 79. These allegations taken together, which must be taken as true, more than plausibly demonstrate a lack of a "robust" negotiating and reviewing process as required by *Jones*, 130 S. Ct. at 1429, and, hence, indicate a lack of independence and conscientiousness on the part of the directors. This evidence of a lack of arm's-length negotiations further establishes the deficiency of the fee-approval process and supports the plausibility of Plaintiff's claim that Defendant has charged excessive investment advisory fees in violation of § 36(b).

## III.   ARGUMENT

### A.   Defendant Advocates an Inappropriate and Impossible Pleading Standard.

Rule 8(a) of the Federal Rules of Civil Procedure requires only "a short and plain statement of the claim showing that the pleader is entitled to relief." The Supreme Court has reaffirmed that this standard "do[es] not require heightened fact pleading of specifics." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). Rather, to defeat a motion to dismiss, a complaint

must simply contain "sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 129 S. Ct. 1937, 1949 (2009) (quoting *Twombly*, 550 U.S. at 570). While this plausibility standard requires a plaintiff to show that success on the merits is more than a "sheer possibility," it is not a "probability requirement." *Id.* Accordingly, a complaint states a plausible claim for relief if its "factual content . . . allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 129 S. Ct. at 1949 (citing *Twombly*, 550 U.S. at 556).

Importantly, the Seventh Circuit has confirmed, post-*Iqbal* and *Twombly*, that "'notice pleading remains the standard'" and that "pleading is meant to 'focus litigation on the merits of a claim rather than on technicalities that might keep plaintiffs out of court.'" *Bausch v. Stryker Corp.*, 630 F.3d 546, 559 (7th Cir. 2010) (internal quotation marks and citations omitted). As the Seventh Circuit has explained: "One objective of Rule 8 is to decide cases fairly on their merits, not to debate finer points of pleading where opponents have fair notice of the claim or defense." *Id.* at 562.

In arguing for dismissal, Defendant completely disregards several fundamental principles of pleading.

First, "the complaint should be read as a whole, not parsed piece by piece to determine whether each allegation, in isolation, is plausible." *Braden v. Wal-Mart Stores, Inc.*, 588 F.3d 585, 594 (8th Cir. 2009); *see also Ocasio-Hernández v. Fortuño-Burset*, 640 F.3d 1, 14 (1st Cir. 2011) (a court must "evaluate the cumulative effect of the factual allegations"). As the First Circuit has explained: "No single allegation need 'lead to the conclusion' . . . of some necessary element, provided that, in sum, the allegations of the complaint make the claim as a whole at least plausible." *Ocasio-Hernández*, 640 F.3d at 14-15.

Second, a plaintiff is not required to set forth "'detailed factual allegations.'" *Iqbal*, 129 S. Ct. at 1949 (citation omitted); *Reynolds v. CB Sports Bar, Inc.*, 623 F.3d 1143, 1146 (7th Cir. 2010) ("The plaintiff need not … plead 'detailed factual allegations.'"). This is especially true since Plaintiff's claim is governed by Rule 8(a), not Rule 9(b), which means "[s]pecific facts are not necessary." *Erickson v. Pardus*, 551 U.S. 89, 93 (2007). Thus, the Seventh Circuit has confirmed: "[A plaintiff] need not plead a detailed set of facts, so long as the complaint supplies [the defendant] with 'fair notice of what … the claim is and the grounds upon which it rests.'" *Smith v. Med. Benefit Adm'rs Grp., Inc.*, 639 F.3d 277, 281 (7th Cir. 2011) (quoting *Erickson*, 551 U.S. at 93).

Third, all reasonable inferences must be drawn in favor of, not *against*, a plaintiff. The Seventh Circuit has repeatedly reaffirmed this principle post-*Iqbal* and *Twombly*. *See, e.g.*, *AnchorBank, FSB v. Hofer*, 649 F.3d 610, 614 (7th Cir. 2011) ("In evaluating the sufficiency of the complaint, we view it in the light most favorable to the plaintiff, taking as true all well-pleaded factual allegations and making all possible inferences from the allegations in the plaintiff's favor."); *Reynolds*, 623 F.3d at 1146 (same). One obvious corollary to this principle Defendant ignores is that a plaintiff need not negate inferences that could be drawn in the defendant's favor. As the Ninth Circuit recently explained:

> If there are two alternative explanations, one advanced by defendant and the other advanced by plaintiff, both of which are plausible, plaintiff's complaint survives a motion to dismiss under Rule 12(b)(6). Plaintiff's complaint may be dismissed only when defendant's plausible alternative explanation is so convincing that plaintiff's explanation is *implausible*.

*Starr v. Baca*, --- F.3d. ----, 2011 WL 2988827, at *14 (9th Cir. July 25, 2011). And the Seventh Circuit has confirmed that a plaintiff is to be given "'the benefit of imagination, so long as the

hypotheses are consistent with the complaint.'" *Bausch*, 630 F.3d at 559 (quoting *Bissessur v. Ind. Univ. Bd. of Trs.*, 581 F.3d 599, 603 (7th Cir. 2009)).

Fourth, a plaintiff needs to only *plead* a claim, not *prove* it. *See AnchorBank*, 649 F.3d at 618 ("Whether [the plaintiffs] are able to support the complaint's allegations and raise a genuine issue of material fact for trial, or whether they will ultimately prevail in their suit against [the defendant], are separate questions that are not properly decided under the procedural vehicle of a Federal Rule of Civil Procedure 12(b)(6) motion to dismiss."). A court is to consider "whether the events alleged could have happened, not whether they did happen or likely happened." *Smith*, 639 F.3d at 281 (citation omitted). Indeed, even with respect to fraud, the Seventh Circuit has confirmed that proof is not part of the pleading requirement. *See United States ex rel. Lusby v. Rolls-Royce Corp.*, 570 F.3d 849, 855 (7th Cir. 2009) ("nor is proof part of the pleading requirement"). If plaintiffs are not required to offer proof of fraud in a complaint, they certainly do not need to do so with respect to claims not subject to heightened pleading requirements. Furthermore, it is axiomatic that the standard for a dismissing a claim under Rule 12(b)(6) is vastly different from the standard for granting summary judgment under Rule 56. Unlike a motion for summary judgment, a motion to dismiss is governed by a pleading standard, not an evidentiary standard. As the Supreme Court held in *Twombly*, "asking for plausible grounds … simply calls for enough fact to raise a reasonable expectation that discovery will reveal evidence of [the alleged misconduct]." 550 U.S. at 556.

Fifth, making allegations upon information and belief is entirely legitimate—and those allegations, like any other allegations, must be accepted as true. *See Arista Records LLC v. Doe 3*, 604 F.3d 110, 120 (2d Cir. 2010) ("The *Twombly* plausibility standard . . . does not prevent a plaintiff from pleading facts alleged 'upon information and belief' where the facts are peculiarly

within the possession and control of the defendant or where the belief is based on factual information that makes the inference of culpability plausible.") (internal quotation marks and citations omitted). "This pleading doctrine protects plaintiffs who cannot reasonably be expected to have personal knowledge of the matter being pled." *Michael v. Letchinger*, No. 10-3897, 2011 WL 3471082, at *16 (N.D. Ill. Aug. 5, 2011) (citing 5 CHARLES ALAN WRIGHT & ARTHUR R. MILLER, FEDERAL PRACTICE & PROCEDURE § 1224, at 300 & n. 7 (3d ed. 2004). Here, the allegations Plaintiff makes upon information and belief concern facts that are peculiarly within the possession and control of Defendant, such as non-public information about the fee-approval process and non-public information about Defendant's internal costs. *See, e.g.*, Compl. ¶¶ 45-47. Defendant conflates stating elements as factual conclusions (which can be disregarded) with stating factual conclusions based upon information and believe (which is entirely permissible).

Finally, it is important to note that Congress intended for private shareholders to play an important role in enforcing the fiduciary duty created by § 36(b). *Daily Income*, 464 U.S. at 536. This is so despite the fact that mutual fund shareholders lack access to crucial inside information regarding the business affairs between funds and their investment advisers. The Seventh Circuit's recent statements about pleading standards in the context of product liability claims involving medical devices are just as applicable, if not more so, to claims brought by shareholders under the ICA. In holding that "[f]ormal discovery is necessary before a plaintiff can fairly be expected to provide a detailed statement of the specific bases for her claim," *Bausch*, 630 F.3d at 558, the Seventh Circuit endorsed Eighth Circuit Judge Melloy's suggestion that "in analyzing the sufficiency of pleadings, 'a plaintiff's pleading burden should be commensurate with the amount of information available to them.'" *Id.* at 561 (quoting *In re Medtronic, Inc., Sprint Fidelis Leads Prods. Liab. Litig.*, 623 F.3d 1200, 1212 (8th Cir. 2010)

(Melloy, J., dissenting)); *see also Braden*, 588 F.3d at 598 (recognizing that plaintiffs in the analogous ERISA context "generally lack the inside information necessary to make out their claims in detail unless and until discovery commences" and holding that "while a plaintiff must offer sufficient factual allegations to show that he or she is not merely engaged in a fishing expedition or strike suit, we must also take account of their limited access to crucial information"). As the Seventh Circuit has recognized: "'If plaintiffs must allege that the defendant [engaged in specific violations] before discovery, then it is difficult to appreciate how any plaintiff will ever be able to defeat a Rule 12(b)(6) motion.'" *Bausch*, 630 F.3d at 561 (quoting *In re Medtronic, Inc.*, 623 F.3d at 1212). Indeed, holding Plaintiff in this case to the impossible pleading standard demanded by Defendant would hamper the remedial scheme of the ICA. *See Braden*, 588 F.3d at 598 (stating in the analogous ERISA context that "[i]f plaintiffs cannot state a claim without pleading facts which tend systemically to be in the sole possession of defendants, the remedial scheme of the statute will fail.").

**B.      Plaintiff's Allegations Sufficiently State a Claim Under § 36(b) of the ICA.**

The facts set forth above in Part II.B., *supra*, more than plausibly state a violation of § 36(b) under the standard set forth in *Jones*, 130 S. Ct. at 1418.

### 1.      The Standard of Liability Under § 36(b)

In *Jones*, the Supreme Court set forth the following concept of "fiduciary duty" from *Pepper*, 308 U.S. at 295, and explicitly adopted it for § 36(b):

> "[Fiduciaries'] dealings with [a beneficiary] are subjected to rigorous scrutiny and where any of their contracts or engagements with the [beneficiary] is challenged the burden is on the [fiduciary] not only to prove the good faith of the transaction but also to show its inherent fairness from the viewpoint of the corporation and those interested therein. . . *The essence of the test is whether or not under all the circumstances the transaction carries the earmarks of an arm's length bargain.* If it does not, equity will set it aside."

*Jones*, 130 S. Ct. at 1427 (quoting *Pepper*, 308 U.S. at 306-07) (emphasis in original; internal quotation marks omitted); *see also Jones*, 130 S. Ct. at 1427 ("We believe this formulation expresses the meaning of 'fiduciary duty' in § 36(b).") (citation omitted). While noting that § 36(b) shifts the burden of proof to the party claiming breach, the Court also stated that "[t]he *Gartenberg* approach fully incorporates this understanding of the fiduciary duty as set out in *Pepper*." *Id.* (discussing *Gartenberg v. Merrill Lynch Asset Mgmt., Inc.*, 694 F.2d 923 (2d Cir. 1982)). Finally, the Court very explicitly explained the role of the fee-approval process in the analysis:

> [A] court's evaluation of an investment adviser's fiduciary duty must take into account both procedure and substance. Where a board's process for negotiating and reviewing investment-adviser compensation is robust, a reviewing court should afford commensurate deference to the outcome of the bargaining process … This is not to deny that a fee may be excessive even if it was negotiated by a board in possession of all relevant information, but such a determination must be based on evidence that the fee "is so disproportionately large that it bears no reasonable relationship to the services rendered and could not have been the product of arm's-length bargaining." [*Gartenberg*, 694 F.2d at 928.]
>
> In contrast, where the board's process was deficient or the adviser withheld important information, the court must take a more rigorous look at the outcome.

*Id.* at 1429-30 (internal citations omitted).

Defendant is wrong in arguing that Plaintiff has misstated the standard of liability for § 36(b) in his Complaint. *See* Def.'s Mot. 6. Defendant's argument is based on a strained reading of Plaintiff's Complaint that takes language out of context and relies on what Defendant labels as an "embedded" assertion. *See* Def.'s Mot. 6-8. Plaintiff does not advocate a "reasonableness" standard or attempt to put the burden of proof on Defendant. Plaintiff merely sets forth legal background for the meaning of "fiduciary duty" and quotes the exact same language from *Pepper* quoted by the Supreme Court in *Jones*. *See Jones*, 130 S. Ct. at 1427.

### 2. The *Gartenberg* Factors

In *Jones*, the Supreme Court recognized the "*Gartenberg* factors" as being among "all [the] pertinent facts" that a reviewing court must examine when analyzing ICA claims. *See Jones*, 130 S. Ct. at 1425 (quoting *Gartenberg*, 694 F.2d at 929). Those factors include: (1) the nature and quality of the services provided; (2) comparative fees; (3) economies of scale; (4) fall-out benefits (i.e., indirect profits to the adviser attributable in some way to the existence of the fund); (5) the profitability of the adviser in providing services to the fund; and (6) the independence and conscientiousness of the directors. *Id.* at 1425-26 & n.5. However, a plaintiff "need not make a conclusive showing of each of the *Gartenberg* factors but, instead, may state a § 36(b) claim by alleging any combination of facts that plausibly support an inference that a particular fee, given all of the surrounding facts and circumstances, is disproportionately large to the services rendered in exchange for that fee." *Curran*, 2010 WL 2889752, at *9; *see also In re Goldman Sachs Mut. Funds Fee Litig.*, No. 04-2567, 2006 WL 126772, at *9 (S.D.N.Y. Jan. 17, 2006) (a motion to dismiss "do[es] not require us to assess whether all six factors have been met"); *Wicks v. Putnam Inv. Mgmt., LLC*, No. 04-10988, 2005 WL 705360, at *4 (D. Mass. Mar. 28, 2005) ("A plaintiff's failure to plead certain *Gartenberg* factors is not itself grounds for dismissal.").[3]

### a. The Nature and Quality of Services

The investment advisory services Defendant provides to the Funds consist of the "investment and reinvestment of the assets of the Funds." Compl. ¶ 31. These services consist of researching, selecting, buying, and selling of securities for the Funds. While Defendant provides

---

[3] Contrary to Defendant's assertion on page 9 of its motion, Plaintiff does *not* concede that the fall-out-benefits factor does not support his claim. There is simply insufficient public information available to make allegations regarding this factor.

some ancillary services under its agreements with the Funds, *id.* at ¶ 34, these services are de minimis and do not entail significant costs to Defendant. *Id*. at ¶ 35. Rather, as Plaintiff has alleged, third parties provide all other services of any significance, and the Funds pay separate fees for those services pursuant to separate agreements. *Id*. at ¶ 34.

Plaintiff's allegation that the ancillary services provided by Defendant are de minimis is supported by academic literature. *See* Compl. ¶ 35. Defendant attempts to bolster its position by inserting a laundry list of ancillary services it supposedly provides, Def.'s Mot. 2-3, but a careful review of this list reveals they are de minimis. Indeed, many of the services entail Defendant merely monitoring, coordinating, or supervising others who perform the actual work. In addition, the funds pay separately for their own legal and accounting work, Compl. ¶ 34, and Defendant merely tries to take credit for essentially duplicative services. Plaintiff's allegation that these ancillary services are de minimis is plausible and must be accepted as true even if Defendant's position is also plausible. *Starr*, 2011 WL 2988827, at *14; *Bausch*, 630 F.3d at 559 (quoting *Bissessur*, 581 F.3d at 603).

Given that any services Defendant provides to the Funds other than investment advisory services are either de minimis or paid for separately, and given that Defendant provides essentially the same investment advisory services to other clients for far lower fees, *see* Part III.B.2.b., *infra*, there is nothing about the nature and quality of the investment advisory services provided to the Funds that justifies their high fees. And there is no question that the fees, particularly for the Artisan International Fund, are high, as evidenced by the "F" fee grade Morningstar assigned it. *See* Part III.B.2.b., *infra*.

The foregoing allegations, which should be viewed in combination with the other facts in the Complaint, *Braden*, 588 F.3d at 594; *Ocasio-Hernández*, 640 F.3d at 14-15, provide more than sufficient support for the proposition that "the services provided have not been of a quality or quantity that would justify the fee arrangement." *In re Federated Mut. Funds Excessive Fee Litig.*, No. 04-352, 2009 WL 5821045, at *8 (W.D. Pa. Sept. 30. 2009). Nevertheless, Defendant argues that Plaintiff's Complaint is insufficient because it fails to address "each Fund's performance as compared with its peers, the specific services provided to the Funds, and the costs to [Defendant] of performing those services." Def.'s Mot. 16. Defendant fails to cite any case in support of this approach, and the Court should not accept Defendant's invitation to create an impossible pleading standard.

In fact, with respect to each Fund's performance, Defendant again speaks out of both sides of its mouth. From one side, Defendant would require Plaintiff to include specific allegations regarding the Funds' performance, but from its other it cites a case that specifically found such an allegation insufficient to satisfy *Gartenberg's* nature-and-quality factor. *See In re Salomon Smith Barney Mut. Fund Fees Litig.*, 528 F. Supp. 2d 332, 337-38 (S.D.N.Y. 2007), *rev'd in part on other grounds sub nom R.W. Grand Lodge of F. & A.M. of Pa. v. Salomon Bros. All Cap Value Fund,* No. 08-0038, 2011 WL 2268551 (2d Cir. June 9, 2011) (finding an allegation that the funds' performance "was not up to par with other similar funds in the industry" insufficient). Had Plaintiff included an allegation along the lines Defendant demands, Defendant would be arguing that the allegation is insufficient.

With respect to other services provided by Defendant, Defendant's reliance on *In re Salomon Smith Barney* is misplaced. In *In re Salomon Smith Barney*, the court dismissed the plaintiffs' claims in part because the plaintiffs failed "to allege anything about the array of

services offered to Fund customers, such as telephone or web assistance or the ease with which transactions are affected." 528 F. Supp. 2d at 338. But what the court was referring to were transfer agency services, which in the case of the Artisan Funds are provided by a third party for a separate fee. Compl. ¶ 34.

Finally, Defendant's insistence that Plaintiff allege facts regarding Defendant's costs in providing investment advisory services to the Funds is disingenuous because Defendant knows Plaintiff does not have access to this information. *See* U.S. General Accounting Office ("GAO"), *Mutual Fund Fees: Additional Disclosure Could Encourage Price Competition* 9 (June 2000) ("[M]utual funds disclose … only those operating costs that have been deducted from the assets of the fund, but not the costs that the advisers incur to operate these funds.").[4] Courts routinely refuse to dismiss claims where "specific financial information is not available prior to discovery." *Krantz v. Fid. Mgmt. & Research Co.*, 98 F. Supp. 2d 150, 159 (D. Mass. 2000); *see also Bausch*, 630 F.3d at 561; *Braden*, 588 F.3d at 598.

### b. Comparative Fee Structures

Defendant cites *Gartenberg* for the proposition that fee comparisons with similar mutual funds are of limited value. *See* Def.'s Mot. 16 (citing *Gartenberg*, 694 F.2d at 929). But Defendant is only half right. A fund with an average fee compared to the industry is not exempt from § 36(b) liability: "Reliance on prevailing industry advisory fees will not satisfy § 36(b)." *Gartenberg*, 694 F.2d at 929. However, a fund's *high* relative fee *is* a relevant factor:

> We do not suggest that rates charged by other adviser-managers to other similar funds are not a factor to be taken into account. Indeed, to the extent that other managers have tended to reduce their effective charges as the fund grows in size, … such a reduction represents the best industry practice [which] will provide a guide.

---

4 Available at http://www.gao.gov/archive/2000/gg00126.pdf.

*Id.* (internal quotation marks and citation omitted).

Here, Morningstar assigned Defendant an "F" for the high fees it charges the Artisan International Fund. Compl. ¶¶ 36, 65. Defendant fails to mention that the only court to have considered Morningstar's stewardship grades in a motion to dismiss a § 36(b) claim denied the motion, specifically citing the fund-at-issue's failing fee grade in doing so. *See In re Federated*, 2009 WL 5821045, at *6. Moreover, Defendant should not be allowed to tout the Funds' grades for other measures of stewardship while simultaneously downplaying the significance of the fee grade,[5] particularly when fees are the central issue in a § 36(b) case.

Defendant is correct, however, that a fund's *low* relative fee is of little evidentiary value because, as the Supreme Court recognized, "these fees … may not be the product of negotiations conducted at arm's length." *Jones*, 130 S. Ct. at 1429 (citing *Gartenberg*, 694 F.2d at 929). Accordingly, Plaintiff compares Defendant's fees with two sets of fees that, unlike the Funds' fees, are negotiated at arm's length. *See* Compl. ¶¶ 61, 66.

### (i)    Defendant's Other Clients

Plaintiff first compares the Fund's fees to the fees Defendant charges its other clients. *See* Compl. ¶¶ 53-63. The investment advisory services Defendant provides to the Funds and its other clients are essentially the same, with the same portfolio managers providing the services, the portfolios containing identical top holdings, and Defendant admitting they are similarly managed. *Id.* at ¶¶ 55, 57-58, 61. Nonetheless, Defendant charges the Funds fee rates that are

---

[5] Defendant's reference to this Court's decision in *White v. Marshall & Isley*, No. 10-311, 2011 WL 2471736 (E.D. Wis. June 21, 2011), is inapposite. Where the "B" ratings were not as severe as the plaintiffs portrayed them there, *id.*, at *7, here, Defendant admits it got an "F" but tries to minimize it. And an "F," in fact, represents "worst" or "no credit." *See* The Morningstar Stewardship Grade for Funds, http://corporate.morningstar.com/us/documents/stewardshipgradefunds/StewGradeMethodology_06-18-07.pdf (last visited Oct. 14, 2011).

almost double or more than its other clients, costing each of the Funds upwards of tens of millions of dollars annually. *Id.* at ¶¶ 58, 61-62.[6]

Defendant complains that Plaintiff's comparison of the Funds to Defendant's other clients does not address the possible differences in services hypothesized in *Jones*, *see* Def.'s

---

[6] Plaintiff alleges that Defendant charged the California Public Employees' Retirement System ("CalPERS") a fee rate of approximately 0.06% to 0.10% of assets. See Compl. ¶ 61.a. In an attempt to refute this allegation, *see* Def.'s Mot. 17 n.14, Defendant attaches an excerpt from the 2002 CalPERS annual report showing that Defendant earned a total of 1.20% of assets in "management and performance fees" for that year. Defendant does not attach information for any other years, and for good reason. That information demonstrates that Defendant's argument is very disingenuous. Summarized below is information extracted from the 2001-2005 CalPERS annual reports [Pl.'s Req. for Judicial Notice Ex. A].

### Summary of CalPERS Annual Report Data
(Dollars in Thousands)

| Year | Net assets | Mgmt. Fees | Performance Fees | Fee Rate |
|------|-----------|-----------|------------------|----------|
| 2005 | $362,711 | $230 | none | 0.06% |
| 2004 | $604,657 | $336 | none | 0.06% |
| 2003 | $629,887 | $270 | none | 0.04% |
| 2002 | $608,738 | $283 | $7,008 | 0.05% 1.20% with perf. fee |
| 2001 | $482,143 | $95 | none | 0.02% |

What this information illustrates is that 2002 was an anomaly. It was the only year Defendant received a "performance fee," which Defendant does not explain. Excluding the 2002 performance fees, Defendant actually received between 0.02% to 0.06% of assets in fees from 2001 to 2005, *less* than what Plaintiff actually pled. Even if one included the 2002 performance fee, Defendant received an average fee of 0.28% in assets from 2001 to 2005 or less than one-third of what it charged the Funds.

It should be noted that Plaintiff has not included the information for 2006 in this table because Defendant stopped providing services to CalPERS sometime in 2006. The annual report for 2006 indicates that Defendant received $40,000 in fees for managing $2,000 in assets. Though not explained in the annual report, the asset figure is likely a fiscal-year-end figure. Defendant presumably began the fiscal year with several hundred million dollars under management (it ended the prior fiscal year managing over $300 million in assets), which dropped to a residual amount of $2,000 after Defendant lost the account. Clearly, Defendant did not receive $40,000 in fees for managing $2,000 in assets; thus, these figures are excluded from the above analysis.

Mot. 18 (citing *Jones*, 130 S. Ct. at 1428-29), and the supposed differences between advisers and sub-advisers, *see* Def.'s Mot. 19. But Defendant is wrong: Plaintiff alleges that any additional services provided to the Funds are either de minimis or paid for separately. Compl. ¶¶ 34-35. This allegation, which is supported by academic literature, *see id.* at ¶ 35, must be taken as true, and Defendant cannot defeat it by merely raising the prospect that there might be other services that might justify the fee discrepancy. See *Starr*, 2011 WL 2988827, at *14; *Bausch*, 630 F.3d at 559 (quoting *Bissessur*, 581 F.3d at 603). Indeed, as Judge Posner observed in the Circuit Court proceedings below in *Jones*: "The panel opinion throws out some suggestions on why [the fee discrepancy] may be justified, but the suggestions are offered purely as speculation, rather than anything having an evidentiary or empirical basis." *Jones v. Harris Assocs. L.P.*, 537 F.3d 728, 731 (7th Cir. 2008) (Posner, J., dissenting to denial of rehearing en banc).[7]

Defendant's insistence that Plaintiff specifically address the concerns raised in *Jones* regarding fee comparisons also ignores the fact that *Jones* involved a decision on summary judgment. At the motion to dismiss stage, plaintiffs do not have access to critical discovery that will aid them in establishing further proof of their claims. It was, for example, only *after* discovery that the plaintiffs in *Gallus v. Ameriprise Fin., Inc.*, 561 F.3d 816 (8th Cir. 2009), *vacated*, 130 S. Ct. 2340 (2010), developed evidence that an institutional account was actually patterned on the fund at issue in the case, that the two accounts had identical investment

---

[7] Defendant also argues that the CalPERS comparison is irrelevant because Defendant did not manage the CalPERS account during the damages period. But this argument misunderstands § 36(b) liability. Defendant has violated § 36(b) by charging the Funds excessive advisory fees regardless of whether Defendant has any other clients. The fee comparisons evidence the excessiveness of Defendant's fees but are not a necessary element of Plaintiff's claims. As the Eighth Circuit aptly observed (albeit in a vacated opinion): "The purpose of an inquiry into the fees paid by institutional [and] non-fiduciary clients is to determine what the investment advice is worth." *Gallus v. Ameriprise Fin., Inc.*, 561 F.3d 816, 824 (8th Cir. 2009), *vacated*, 130 S. Ct. 2340 (2010).

objectives and very similar stock holdings, and that the same portfolio manager made the same investment decisions for both accounts. 561 F.3d at 819. The lack of discovery is precisely why a plaintiff need only put forth allegations that "raise a reasonable expectation that *discovery* will reveal evidence of [the alleged misconduct]." *Twombly*, 550 U.S. at 556 (emphasis added).

### (ii) Vanguard

Plaintiff also compares the Funds' fees with the fees paid by actively managed Vanguard funds to third-party advisers for comparable services. Compl. ¶¶ 66-68. The Artisan Funds pay advisory fee rates that are four or more times the fee rates paid by similar Vanguard Funds, costing each of the Funds tens of millions of dollars in fees annually. *Id.* at ¶¶ 67-68. While Defendant claims that the Vanguard comparisons are "inapt for a number of reasons," Def.'s Mot. 20, none of these reasons addresses the purpose of the comparison—to show what fees negotiated at arm's length look like. While the Vanguard complex consists of both internally and externally managed funds, the third parties who provide investment advisory services to the externally managed funds are for-profit businesses. Compl. ¶ 66. These Vanguard fees provide a means of analyzing the costs of providing investment advisory services to similar funds, the economies of scale realized by Defendant, and a market-based comparison that illustrates the excessiveness of the Funds' fees.

### c. Economies of Scale

Defendant has realized significant economies of scale as the Funds have grown over time. Compl. ¶ 75. Economies of scale have occurred because the work required to provide investment advisory services to the Funds (i.e., the research, selection, and trading of securities) has not increased proportionately with the assets of the Funds. Indeed, the work is the same for both a one billion dollar fund and a ten billion dollar fund. *Id.* at ¶¶ 69-71. Yet, while the Funds

have grown over time, the fee rates for the Funds, with one minor exception, have not changed since their inception. *Id*. at ¶ 48. Further, the existence of economies of scale in the mutual fund industry has been confirmed time and again by the SEC, the GAO, academic researchers, and industry insiders, including David Swensen (Chief Investment Officer for Yale University) and John Bogle (founder of Vanguard). *Id*. at ¶¶ 69, 72-74. Nonetheless, Defendant would have this Court draw the unreasonable inference that economies of scale do not exist because Plaintiff lacks access to the proprietary information necessary to calculate precisely the economies of scale realized by Defendant in managing each Fund.

Defendant seeks to hold Plaintiff to an impossible pleading standard. As discussed above, Plaintiff does not have access to Defendant's internal costs, *see* GAO Report, *supra*, at 18, which are necessary to calculate economies of scale, and courts have refused to dismiss claims based upon a lack of information where "specific financial information is not available prior to discovery." *Krantz*, 98 F. Supp. 2d at 159; *see also Bausch*, 630 F.3d at 561; *Braden*, 588 F.3d at 598. Nonetheless, the factual allegations in Plaintiff's Complaint are more than sufficient to allow this Court to draw the reasonable inference that Defendant has realized substantial economies of scale in managing each Fund, and the Court should not draw the *unreasonable* inference against Plaintiff that economies of scale do not exist. *Starr*, 2011 WL 2988827, at *14; *Bausch*, 630 F.3d at 559 (quoting *Bissessur*, 581 F.3d at 603).

Plaintiff also has sufficiently alleged that Defendant has misappropriated the economies of scale for itself and has failed to pass them on to the Funds' shareholders in any meaningful way. Compl. ¶¶ 75-78. To illustrate this point, Plaintiff points to the actual breakpoints in the fee schedules for Defendant's other clients, who bargain with Defendant at arm's length. For example, the fee schedule for the Clearwater International Fund starts at 0.80% of assets but

drops 20 basis points to 0.60% at $50 million in assets and drops another 10 basis points to 0.50% at $100 million in assets. *Id*. at ¶ 61.b. Thus, the Clearwater International Fund's fee rate drops nearly 40% (from 0.80% to 0.50%) over the course of reaching $100 million in assets. In contrast, the fee schedule for the Artisan International Fund starts at 1.00% of assets but drops only 2.5 basis points to 0.975% at $500 million is assets, with additional drops of only 2.5 basis points at $750 million, $1 billion, and $12 billion, ending up at 0.90% for assets over $12 billion. *Id*. at ¶ 33. Thus, the Artisan International Fund's fee rate drops only 10% (from 1.00% to 0.90%) over the course of reaching $12 *billion* in assets. As a consequence, each of the Artisan Funds has missed out on tens of millions of dollars in economies-of-scale savings because Defendant refuses to share them to the same extent it does with its other clients. *Id*. at ¶ 62.

Defendant's contention regarding the breakpoint comparison is that Plaintiff "alleges no facts sufficient to permit any more than speculation as to whether the services provided to the Funds are comparable to those provided to [the other clients], such that similar economies of scale could be achieved." Def.'s Mot. 22. But this just rehashes Defendant's argument against fee comparisons with other clients in general. As explained in Part III.B.2.b.(i), *supra*, Plaintiff has alleged that the services are comparable because, as Defendant admits, client accounts within a strategy are managed similarly, sharing portfolio managers and having the exact same top holdings. Compl. ¶ 57. Certainly Defendant's own admissions must be taken as true.

Defendant also asks for a pass on the economies-of-scale factor because the fee schedules for the Funds contain breakpoints. Def.'s Mot. 23. But the breakpoints for the Funds are very slight compared to the breakpoints for Defendant's other clients. Compl. ¶ 76. And just because breakpoints exist does not mean that Defendant has *adequately* shared economies of scale with the Funds. Indeed, each of the Funds has missed out on tens of millions of dollars in economies-

of-scale savings because Defendant does not share them to the same extent it does with its other clients.  In this regard, it is important to note that § 36(b) was enacted in large part because "Congress wanted to ensure that investment advisers passed on to fund investors the savings that they realized from . . . economies of scale."  *Migdal v. Rowe Price-Fleming Int'l, Inc.*, 248 F.3d 321, 327 (4th Cir. 2001).  Allowing a defendant to avoid liability by simply offering breakpoints – no matter how small and particularly where the facts establish that a defendant offers significantly more favorable breakpoints to other clients who bargain at arm's length – would defeat the remedial purpose of the statute.

### d.      The Profitability of the Fund to the Adviser

Defendant realizes excessive profits from providing investment advisory services to the Funds as compared to providing the same services to its other clients.  These excess profits are the result of its discriminatory pricing of investment advisory services and its misappropriation of economies of scale.  Compl. ¶¶ 75, 82.  By way of illustration, while the retail mutual funds managed by Defendant have accounted for just slightly more than half of Defendant's assets under management over the past three years, those funds have accounted for more than two-thirds of Defendant's revenues, and Defendant has generated a profit margin on the funds that is approximately double what it has generated on its other clients.  *Id*. at ¶ 82.

Defendant's contention regarding profitability is that "[i]n the absence of factual allegations concerning [Defendant's] *costs* of providing services to the Funds, there is no way to determine the *profitability* to [Defendant] of providing those services."  Def.'s Mot. 24.  While Plaintiff agrees that it cannot calculate Defendant's exact (undisclosed) profitability, Defendant is wrong to suggest that Plaintiff should be required to do so given that Plaintiff does not have access to Defendant's internal costs.  *See* GAO Report, *supra*, at 18; *Bausch*, 630 F.3d at 561;

*Braden*, 588 F.3d at 598; *Krantz*, 98 F. Supp. 2d at 159. Plaintiff's allegations plausibly show from the available facts that Defendant has realized excessive profits from providing investment advisory services to the Funds as it has earned higher profits from those funds to whom it owes a fiduciary duty than from the accounts to whom it does not owe a fiduciary duty.

### e.    The Independence and Conscientiousness of the Directors

Despite dramatic growth in the assets of the Funds and the addition of new funds to the Artisan complex over the years, the fee schedules for the Funds, with their inadequate breakpoints, have remained unchanged since their inception, with one minor exception. Compl. ¶ 48. None of the fee schedules for the Funds contain any breakpoints after $1 billion in assets except that for the Artisan International Fund, which has a slight additional breakpoint at $12 billion in assets. *Id.* This remains true even though each of the Funds is well past $1 billion in assets, and the Artisan International Fund has been past $12 billion in assets. *Id.* These facts support Plaintiff's allegation that Defendant does not provide the directors with sufficient, complete, or accurate information and has, in fact, made misleading representations to the directors regarding (1) the services it provides and advisory fees it charges its other clients, (2) economies of scale, and (3) Defendant's profitability. Compl. ¶¶ 45-47, 79. Plaintiff has also alleged that the directors rarely, if ever, questions any information or recommendations provided by Defendant. *Id.* at ¶ 47.

The foregoing clearly indicates a lack of independence and conscientiousness on the part of the directors, a lack of arm's-length negotiations, and a deficient fee-approval process. Nonetheless, Defendant responds for the most part as if Plaintiff only alleged that the directors are well compensated and dependent on Defendant. *See* Def.'s Mot. 10-11. And in claiming that Plaintiff has conceded that the directors are statutorily disinterested (which Plaintiff has not),

Def.'s Mot. 11, and pointing out their purported qualifications, Defendant misses the point of this *Gartenberg* factor. The question is not whether the directors are technically disinterested under the statute or professionally accomplished; the question is whether the directors acted with independence and conscientiousness. *See Orman v. Cullman*, 794 A.2d 5, 25 n. 50 (Del. Ch. 2002) ("Although interest and independence are two separate and distinct issues, these two attributes are sometimes confused by parties."). This distinction is important. Just because a director is technically disinterested does not mean the director has acted independently and conscientiously.

Plaintiff lacks information as to the technical status of the directors under the statute, just as Plaintiff lacks specific information about the fee-setting process, because that information is solely within the possession and control of Defendant. But this should not doom Plaintiff's Complaint, *see Bausch*, 630 F.3d at 561; *Braden*, 588 F.3d at 598; *Krantz*, 98 F. Supp. 2d at 159, and for good reason. In *Gallus*, for example, only after discovery did the plaintiffs learn that the defendant had provided inaccurate and misleading materials to the directors (despite the qualifications of the directors). *See Gallus*, 561 F.3d at 824. Likewise, in *In re Am. Mut. Funds Fee Litig.*, No. 04-5593, 2009 WL 5215755, at *55 (C.D. Cal. Dec. 28, 2009), only after discovery were plaintiffs able to develop evidence that the directors "did not diligently inquire into some issues of importance and failed to recognize the consequences of some of the information presented to them." As the court observed: "These failures are significant given the [d]irectors' important role as 'independent watchdogs' with primary responsibility for protecting shareholder interests. Without exacting scrutiny by these directors, the possibility exists that issues of significant importance will not receive the attention they deserve, ultimately harming investors." *Id.* (citing *Burks v. Lasker*, 441 U.S. 471, 483 (1979)).

Regardless of what Plaintiff has not alleged, the facts that he *has* alleged, based on the limited information available to him, are a far cry from the "formulaic recitation" or "threadbare recitation" criticized in *Twombly* and *Bissessur*. Rather, the facts Plaintiff alleges are more than sufficient to call into question the independence and conscientiousness of the directors, thus meeting this factor for purposes of Defendant's motion to dismiss.

## C. Defendant Ignores Relevant Cases and Relies on Inapposite Cases.

As noted at the outset, at least eight other courts have denied motions to dismiss complaints with allegations similar to those in this case, two of which were decided after *Iqbal* and *Twombly*, and one also after *Jones*.[8] As the complaints in these eight cases are substantially similar, Plaintiff will only discuss the two decisions decided after *Iqbal* and *Twombly*.

In *In re Federated,* 2009 WL 5821045, the court, applying the *Iqbal/Twombly* standard for motions to dismiss, held that a complaint containing similar allegations as the Complaint here set forth "sufficient factual matter to make the claim of entitlement plausible of its face and create a reasonable expectation that discovery will produce evidence sufficient to support the claim." *Id.* at *3. The court summarized the complaint as follows:

> Plaintiffs have alleged that the process leading to the fees charged to the [fund at issue] did not disclose meaningful and specific information needed to assess the relationship of the fees being charged to the services being provided. They have alleged that the fees charged are excessive under any relevant comparison. They have alleged that the services provided have not been of a quality or quantity that would justify the fee arrangement. They have alleged that the defendants have completely failed to pass along any economies of scale gained by the fund's growth over recent years through merger and otherwise and instead have

---

[8] *See Curran*, 2010 WL 2889752; *In re Federated*, 2009 WL 5821045; *Sins v. Janus Capital Mgmt., LLC*, No. 04-1647, 2006 WL 3746130 (D. Colo. Dec. 15, 2006); *Hunt v. Invesco Funds Grp, Inc*., No. 04-2555, 2006 WL 1581846 (S.D. Tex. June 5, 2006); *Dumond v. Mass. Fin. Servs. Co.*, No. 04-11458, 2006 WL 149038 (D. Mass. Jan. 19, 2006); *Jones v. Harris Assocs. L.P.*, No. 04-8305, 2005 WL 831301 (N.D. Ill. Apr. 7, 2005); *Strigliabotti v. Franklin Res. Inc.*, No. 04-0883, 2005 WL 645529 (N.D. Cal. Mar. 7, 2005); *Gallus v. Am. Express Fin. Corp.*, 370 F. Supp. 2d 862 (D. Minn. 2005).

consumed these saving for their own benefit or the benefit of other funds managed within the same complex of funds, a practice which section 36(b) was aimed at curtailing.

*Id.* at *8. After noting that "[a] number of courts have upheld complaints founded on similar allegations," *id.*, the court stated: "[C]ontrary to defendants' efforts to characterize the allegations of the [complaint] as formulaic recitations of legal principles, assertions that lack meaning without proper context, or naked assertions incapable of further factual enhancement, plaintiffs' allegations are grounded in sufficient fact or are derived from concrete factual matter." *Id.*

In *Curran*, where the court applied the *Iqbal/Twombly* standard for motions to dismiss as well as the *Jones* standard for § 36(b) liability, the defendants argued (as does Defendant here) that the complaint was "composed of generalized criticisms of the mutual fund industry as a whole and lack[ed] sufficiently detailed factual allegations to survive [a motion to dismiss]." 2010 WL 2889752, at *8. But after noting that the complaint (like the Complaint here) also contained "numerous factual allegations specific to [the defendants] that support[ed the plaintiffs'] § 36(b) claim," *id.*, the court held that the complaint "more than adequately state[d] a § 36(b) claim," *id.* at *9.

Both *Federated* and *Curran* involved complaints with allegations similar to the allegations in the Complaint here, and the courts' analyses in those cases compels denial of Defendant's motion to dismiss in this case as well. However, rather than address these cases, or any of the other six cases involving similar complaints, Defendant instead relies on cases dismissing very different complaints.

Defendant relies most heavily on *Amron v. Morgan Stanley Investment Advisors Inc.*, 464 F.3d 338 (2d Cir. 2006). *Amron* involved two complaints filed in 2003. A review of these

complaints reveals that, other than facts about the funds' allegedly "poor performance," the complaints contained hardly any facts at all. *See Amron*, 464 F.3d at 341, 344-45; *see also* Complaint, *Amron v. Morgan Stanley Inv. Advisors Inc.*, No. 03-5896, 2003 WL 25659496 (S.D.N.Y. Aug. 6, 2003) [Pl.'s Req. for Judicial Notice Ex. B]; Complaint, *Yampolsky v. Morgan Stanley Inv. Advisors Inc.*, No. 03-5710 (S.D.N.Y. July 31, 2003) [Pl.'s Req. for Judicial Notice Ex. C]. In particular, they lacked the specific and extensive fee comparisons that Plaintiff's Complaint includes. *Amron*, 464 F.3d at 344-45. Further, rather than alleging facts that would allow a court to draw an inference that the fee-approval process itself was flawed (as Plaintiff does in this case), the *Amron* and *Yampolsky* complaints merely leveled legally inadequate accusations against the directors' independence. *See id.* at 345.

The two other cases Defendant heavily cites are *In re Salomon Smith Barney,* 528 F. Supp. 2d 332, and *Hoffman v. UBS-AG*, 591 F. Supp. 2d 522 (S.D.N.Y. 2008). These cases, filed by overlapping counsel in 2006, involved very similar allegations complaining about a broad array of fees and industry practices, with particular attention focused on 12b-1 fees and sales and distribution practices. *See* Second Consolidated Amended Complaint ¶¶ 3, 6-7, 26-30, 61-84, *In re Salomon Smith Barney Mut. Fund Fees Litig.*, No. 04-4055 (S.D.N.Y. Oct. 16, 2006) (ECF No. 63) ("*SSB* Compl.") [Pl.'s Req. for Judicial Notice Ex. D]; Consolidated Amended Class Action Complaint ¶¶ 162-74, 199-210, *Hoffman v. UBS AG*, No. 05-6817, 2006 U.S. Dist. Ct. Pleadings LEXIS 18204 (S.D.N.Y. May 3, 2006) ("*Hoffman* Compl.") [Pl.'s Req. for Judicial Notice Ex. E].[9] *Hoffman* was a "class action" case focusing mainly on distribution fees and their use for shelf space payments (where investment advisory fees appear to be an

_____

[9] *Hoffman* also alleged a number of securities violations in connection with the defendants' sales practices, which made up the bulk of the complaint but are not at issue here.

afterthought) that is inapposite here.  Rather than deal with the specifics of any particular fee (as Plaintiff does here with respect to the Funds' investment advisory fees), the *Hoffman* and *Salomon* plaintiffs directed their allegations at the funds' overall expense ratios.  *SSB* Compl. ¶¶ 30, 41-50; *Hoffman* Compl. ¶¶ 174, 180-83.  And unlike Plaintiff here, the plaintiffs in those cases did not draw any comparisons with fees paid by the defendants' other clients for similar services, focusing instead on general comparisons with the industry.  *SSB* Compl. ¶¶ 55-56; *Hoffman* Compl. ¶ 198.

A careful review of the complaints in the cases cited by Defendant reveal that they bear little resemblance to Plaintiff's Complaint.[10]  The *Curran* and *Federated* complaints, on the other hand, as well as the complaints in the other six cases cited by Plaintiff above, contain allegations substantially similar to Plaintiff's allegations here, and these complaints were upheld both before and after *Twombly*, *Iqbal*, and *Jones*.  The court should likewise uphold the Complaint here.

## IV.    CONCLUSION

Plaintiff's allegations taken as a whole put Defendant on fair notice of the claims and their grounds and more than plausibly demonstrate that Defendant has breached its fiduciary duty to the Funds by charging excessive investment advisory fees in violation of § 36(b) of the ICA.  Accordingly, the Court should deny Defendant's motion to dismiss.

---

[10] Plaintiff has collected, to the extent available from PACER (and excluding partial filings), the other complaints Defendant alleges, or implies, are similar to the Complaint here.  Because of space limitations, and to avoid overburdening the court, Plaintiff has not addressed these cases and has instead limited his analysis to the cases most heavily relied upon by Defendant.  However, Plaintiff requests that the Court take judicial notice of these other complaints [Pl.'s Req. for Judicial Notice Exs. F-J].  A review of these complaints reveals that they are similar to the other complaints cited by Defendant.  In fact, almost all of them were filed by the two sets of counsel who filed the complaints addressed above.  None of the complaints is similar to the Complaint here or the other complaints that have been upheld both before and after *Twombly*, *Iqbal*, and *Jones*.

DATED this 19th day of October, 2011.

KELLER ROHRBACK L.L.P.


By    s/ Tana Lin                     
Lynn Lincoln Sarko (SBN 1010823)
Michael D. Woerner (SBN WA/15452)
Tana Lin (SBN WA/35271)
Attorneys for Plaintiffs
Keller Rohrback, PLC
1201 3rd Avenue, Suite 3200
Seattle, WA 98101
Phone: 206-623-1900
Fax: 206-623-3384
lsarko@kellerrohrback.com
mwoerner@kellerrohrback.com
tlin@kellerrohrback.com


James C. Bradley (SBN SC/16611)
Michael J. Brickman (SBN SC/000874)
Nina H. Fields (SBN SC/68294)
Attorneys for Plaintiffs
Richardson, Patrick, Westbrook & Brickman, LLC
1017 Chuck Dawley Blvd. (29464)
Post Office Box 1007
Mount Pleasant, SC 29465
Phone: 843-727-6500
Fax: 843-881-6183
jbradley@rpwb.com
mbrickman@rpwb.com
nfields@rpwb.com


Guy M. Burns (admission pending)
Jonathan S. Coleman (admission pending)
Attorneys for Plaintiffs
Johnson, Pope, Bokor, Ruppel & Burns, LLP
403 East Madison Street, Suite 400
Tampa, Florida 33602
Phone: 813-225-2500
Fax: 813-223-7118
guyb@jpfirm.com
jonathanc@jpfirm.com

Diane A Nygaard (admission pending)
Attorney for Plaintiffs
Kenner Schmitt Nygaard, LLC
117 West 20th Street, Suite 201
Kansas City, MO  64108
Phone: 816-531-3100
Fax: 816-531-3600
diane@nygaardlaw.com

Timothy S. Trecek (SBN 1021161)
Attorney for Plaintiffs
Habush Habush & Rottier SC
777 E. Wisconsin Avenue, Suite 2300
Milwaukee, Wisconsin 53202
Phone: 414-271-0900
Fax: 414-271-6854
ttrecek@habush.com