UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN

| | |
|---|---|
| EDWIN L. RESO, for the use and benefit of The Artisan International Fund, The Artisan International Value Fund, and The Artisan Mid Cap Value Fund,<br><br>        Plaintiff,<br>v.<br><br>ARTISAN PARTNERS LIMITED PARTNERSHIP<br><br>        Defendant. | Case No. 11-CV-873-JPS<br><br><br><br>ORDER |

  On September 16, 2011, the Court received this case on transfer from the Northern District of California. (Docket #43, 44). The plaintiff, Edwin Reso ("Reso"), invests in several mutual funds that receive investment advising services from the defendant, Artisan Partners Limited Partnership ("Artisan"). (Compl. ¶ 5–6). Reso has brought this action on behalf of himself and the mutual funds in which he invests, arguing that Artisan has breached its fiduciary duty to the funds in violation of Section 36(b) of the Investment Company Act of 1940 (ICA). (Compl. ¶¶ 7–9 (citing 15 U.S.C. § 80a-1, *et seq.*)). Essentially, Reso alleges that Artisan charges excessive fees to the Mutual Funds, thus breaching the 36(b)-imposed fiduciary duty that Congress created to regulate the fees charged to mutual funds by investment advisors. (Compl. ¶¶ 9, 11).

  While this case was pending in the Northern District of California, Artisan filed a motion to dismiss, which Artisan has now renewed in this Court. (Docket #34, 61). After Artisan filed its brief in support of its renewed

motion to dismiss, Reso filed a response brief. (Docket #62, 66). And, now that Artisan has filed its reply brief, the Court rules on Artisan's renewed motion. (Docket #74).

For the reasons below, the Court will deny Artisan's renewed motion to dismiss the case.

1.  FACTUAL BACKGROUND

Artisan advises each of the funds in which Reso invests and on behalf of which he has brought this action. (Compl. ¶¶ 6, 8). For its advising services, Artisan receives a fee based on a percentage of each fund's assets. (Compl. ¶¶ 31–32). This fee is not based on Artisan's actual costs, which Reso alleges consist mainly of "*de minimis*" costs for office rental, equipment and personnel. (Compl. ¶¶ 32, 34–35). Artisan points out that it provides a number of services to Reso and the funds, including making investment decisions, negotiating and choosing transaction services, preparing regulatory filings, managing legal matters, setting up board meetings, providing shareholder services, dealing with tax-related matters, and a number of other tasks associated with the advisement of a mutual fund. (Def.'s Mot. Dism. 2 (citing Compl. ¶¶ 8, 34; Investment Advisory Agreement for Artisan International Fund, Def.'s App. Ex. A, at 1; Amended S-1 (cited in Compl. ¶ 82); Statement of Additional Information, Def.'s App. Ex. E, at 45–46, 54 (cited in Compl. ¶ 57))). Reso alleges that the funds themselves pay for many of those services, as opposed to those costs being covered by the fee paid to Artisan. (Compl. ¶ 34).

Artisan's fee and the services it provides are governed by Investment Advisory Agreements between it and each of the funds. (Compl. ¶ 8). Pursuant to the Advisory Agreements, each fund pays Artisan a monthly fee, which is computed as a percentage of the fund's average daily assets.

(Compl. ¶ 32). The Advisory Agreements also set forth "breakpoints." (Compl. ¶ 33). When the funds' assets reach those breakpoints, the percentage used to compute Artisan's fee is reduced. (Compl. ¶ 33). The terms of these Advisory Agreements are predominantly the same as between each fund, though the International Fund's agreement contains an additional breakpoint. (Def.'s App., Ex. A; Def.'s App., Ex. B; Def.'s App., Ex. C).

Under Section 15(a) of the ICA, Artisan's Advisory Agreements must be approved every year to remain effective. The Advisory Agreements must receive the approval of: (1) a majority of uninterested board members; and (2) either: (a) the board as a whole; or (b) a majority of each fund's shareholders. 15 U.S.C. §§ 80a-15(a), (c).

The Advisory Agreements that apply to the funds in this case have received the required approval every year, but Reso takes issue with the fact that their terms are not as favorable as those that apply to other funds—some managed by Artisan and some with no relation to Artisan. (Pl.'s Resp. 3–4 (citing Compl. ¶¶ 53, 55–58, 61, 64, 66–67)). Reso points out that Artisan manages a number of other funds, which share the same managers and holdings but pay lower fees than the funds in this case. (Compl. ¶¶ 55, 57, 58, 61). Specifically, Reso identifies the California Public Employees' Retirement System, the Clearwater International Fund, and the Wells Fargo Advantage Diversified International Fund, as receiving services from Artisan at a lower rate than the funds in this case. (Compl. ¶¶ 61–62). Reso argues that the lower-rate funds received those lower rates as a result of their arm's-length bargaining position. (Compl. ¶ 58). And, to be sure, if the funds in this case received the benefit of those lower rates—which range from 10% to 50% less—they would pay substantially less in fees to Artisan. (Compl. ¶¶ 61–62).

In fact, Reso alleges that the funds would save between $32 million and $63 million annually. (Compl. ¶ 62).

Reso also states that the Artisan-managed funds in this case have higher fees than similarly-sized, similarly-managed Vanguard funds that receive comparable services. (Compl. ¶¶ 66–67). Again, Reso argues that the lower fees charged to the Vanguard funds is a result of those funds' ability to negotiate their fees at arm's length. (Pl.'s Resp. 3–4 (citing Compl. ¶ 66)). The Artisan funds pay rates that are four times those paid by the Vanguard funds, and could save $30 million to $54 million annually in fees, if it were entitled to similar rates. (Compl. ¶¶ 67–68).

Reso also alleges that Artisan's fees are high by industry standards. (Compl. ¶ 64). Because its fees rank in the highest 40% of those charged by similar mutual funds, Artisan received a grade of "F" for its fees from Morningstar. (Compl. ¶ 36, 65).

Finally, Reso turns to the Advisory Agreements, and points out that Artisan has received significant economies of scale from its management of the funds in this case, but has not passed along savings to its customers or significantly altered its Advisory Agreements to reflect those economies. (Pl.'s Resp. 4–7 (citing Compl. ¶¶ 33, 45–48, 61.b, 62 75–77, 82)). Reso alleges that the funds in this case have grown over time, allowing Artisan to take the same percentage from a higher pool of funds with little additional work. (Compl. ¶ 48, 55–61). Significant breakpoints would help to alleviate this problem by reducing the percentage to which Artisan is entitled as the assets grow larger. (*See* Compl ¶¶ 55–61).

Reso brings to light a number of interesting comparisons between the breakpoints of the funds in this case and the other Artisan-managed funds. The funds in this case are entitled to several breakpoints. (Compl. ¶ 33). The

first occurs when the fund reaches $500 million, and is a drop of 2.5 basis points, from 1.000% to 0.975%; similar 2.5 basis point drops also occur at $750 million, $1 billion, and $12 billion. (Compl. ¶ 33). On the other hand, the Clearwater International Fund—which has lower fees to begin with—receives a 20 basis point drop from 0.800% to 0.600% at $50 million, and another 10 basis point drop at $100 million. (Compl. ¶ 61.b). Thus, the Clearwater International Fund's fee rate drops 30 basis points, or nearly 40% from its original rate, over the course of reaching $100 million in assets. Meanwhile, over the course of reaching $12 billion in assets, the funds in this case receive a reduction of only 10 basis points, or 10% from the original rates. (Pl.'s Resp. 5). Reso alleges that this type of disparity has resulted in the funds in this case contributing an excessively large amount to Artisan's profits. (Compl. ¶¶ 75, 82). Even though the funds in this case account for only one-half of Artisan's total managed assets, the funds provide more than two-thirds of Artisan's profits. (Compl. ¶ 82).

Seeking redress, Reso has sued Artisan for breach of fiduciary duty under the ICA. (Docket #1). Artisan moved to dismiss Reso's suit for failure to state a claim (Docket #61), and this Court now decides that motion.

2.   STANDARD OF REVIEW ON MOTION TO DISMISS

To survive a motion to dismiss, "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 129 S. Ct. 1937, 1949 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). A claim is plausible when the plaintiff has alleged in his complaint "factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *White v. Marshall & Ilsey Corp.*, No. 10-CV-311, 2011 WL 2471736 at *2 (E.D. Wis. June 21, 2011).

Of course, in making a decision, the court must accept all well-pleaded allegations as true. *Twombly*, 550 U.S. at 570. Also, as Reso correctly points out, the Court must draw all reasonable inferences in favor of the plaintiff. *AnchorBank, FSB v. Hofer*, 649 F.3d 610, 614 (7th Cir. 2011) (stating that courts must make "all possible inferences from the allegations in favor of the plaintiff").

3. DISCUSSION

There are two issues that the Court must address in reaching a decision on whether to grant the Artisan's motion to dismiss. First, the Court must determine whether it can consider certain facts alleged by Reso, which Artisan asserts are insufficiently specific. (*See* Def.' Br. in Supp. 8–9; Def.'s Reply 1–4). Second, the Court must decide whether Reso alleged specific facts in his complaint to state a plausible claim for relief under Section 36(b) of the ICA, which requires satisfaction of the *Gartenberg* standard. (*See* Pl.'s Resp. 12–30 (discussing *Jones v. Harris Associates, L.P.*, 130 S. Ct. 1418, 1425 (citing *Gartenberg v. Merrill Lynch Asset Management, Inc.*, 694 F.2d 923, 928 (2d Cir. 1982), as setting forth a number of factors that provide "all the pertinent facts" that a court should look to in deciding whether a fee violates section 36(b)))).

3.1 Factual Issues

Artisan first argues that many of Reso's factual allegations are mere conclusions, not entitled to be taken as true by the Court and also not specific enough to state a claim for relief that is plausible, as required under *Iqbal*. (Def.'s Reply 1 (citing *Iqbal*, 129 S. Ct. at 1949)). Artisan points out that Reso made many of his factual allegations "solely 'on information and belief.'" (Def.'s Reply 1). Specifically, Artisan indicates that Reso has made several allegations based on "information and belief" that relate to the *Gartenberg*

factors. (Def.'s Reply 2 (citing Pl.'s Resp. 17, 22, 24, 26)). Artisan states that such "information and belief" allegations are "pure speculation," and that Reso did not make a reasonable inquiry into verifying them. (Def.'s Reply 2–3). Artisan also notes that many of the factual allegations in Reso's complaint have been copied—sometimes verbatim—from briefs filed by Reso's attorneys in similar cases against other mutual funds. (Def.'s Reply 2–3).

As unsatisfied as Artisan may be with Reso's factual allegations, the Court cannot disregard those allegations. In all of Artisan's discussion of the allegations, Artisan fails to cite any case that stands for the proposition that allegations made on "information and belief" can be disregarded if the Court finds that the alleging party has not made a reasonable inquiry into them. Artisan does cite *Sins v. Janus Capital Mgmt. LLC*, a case in which the deciding court spoke poorly of—but, nonetheless, did not dismiss—one of Reso's lawyers' verbatim complaints. (Def.'s Reply 4 (citing *Sins v. Janus Capital Mgmt. LLC*, 2006 WL 3746130 at *2, *4 (D. Colo. Dec. 15, 2006) (in which the court stated that "[t]he number of apparently generic, boiler plate allegations in the Amended Complaint cause me to question whether reasonable inquiry underlies the allegations made 'on information and belief.' I nonetheless find that Plaintiffs have alleged facts sufficient to state a claim upon which relief may be granted."))). Artisan also implies that, because *Sins* was decided prior to *Twombly* and *Iqbal*, the *Sins* court may have decided the motion differently and dismissed the case if it had been decided today. (Def.'s Reply 4). *Sins* was certainly decided after both *Twombly* and *Iqbal*, but the Court will not speculated as to whether the *Sins* court would have reached any different result. Further, neither *Twombly* nor *Iqbal* deal with issues related to pleading facts "on information and belief," and therefore the Court is not convinced

that those cases should have any impact on the issue at hand. *See, e.g.*, *Iqbal*, 129 S. Ct. 1937, *Twombly*, 550 U.S. 544.

In fact, even if a case did allow the Court to disregard such allegations, the Court would not do so here. The mere fact that allegations are somewhat generic and have been pled elsewhere does not give the Court sufficient indicia that Reso's lawyers failed to reasonably inquire into the circumstances in this case. Reso's lawyers could very well have performed some inquiry, but simply resorted to using a standard pleading when filing this case. Such "cookie-cutter" tactics may be unfavorable and even quite dangerous—Reso's lawyers run the risk of over- or under-inclusion—but they do not require this Court to conclude that Reso's lawyers have failed to do their jobs.

Thus, even though some of Reso's allegations are generic, the Court will not disregard any of them.

3.2 Evaluation of Reso's Claims Under the *Gartenberg* Standard

Having decided that it will look to all of Reso's alleged facts in deciding Artisan's motion to dismiss, the Court now turns to the substantive issue of whether Reso's factual allegations state a plausible claim for relief.

In *Jones*, the Supreme Court stated that, "to face liability under § 36(b), an investment adviser must charge a fee that is so disproportionately large that it bears no reasonable relationship to the service rendered and could not have been the product of arm's length bargaining." *Jones*, 130 S. Ct. at 1426 (adopting the standard set forth in *Gartenberg*, 694 F.2d at 929–30). The *Jones* court also expressed its approval of the multi-factor *Gartenberg* test as taking into account all of the circumstances relevant in deciding a Section 36(b) claim. *Jones*, 130 S. Ct. at 1427 (citing *Gartenberg*, 694 F.2d 929 (2d Cir. 1982)).

As such, this Court will look to the *Gartenberg* factors to determine whether Reso has alleged facts sufficient demonstrate a plausible claim for relief. The *Gartenberg* factors include: (1) the independence, care, and conscientiousness of a fund's directors in approving advisory agreements; (2) the nature and quality of services provided by the advisor; (3) comparative fee structures; (4) economies of scale reaped by the advisor; and (5) profitability of the fund to the advisor. *Jones*, 130 S. Ct. at 1425–26 & n. 5 (citing *Gartenberg*, 694 F. 2d at 929–32) (this Court has changed the sequence of the *Gartenberg* factors from the listing in the *Jones* decision).

As Reso points out, several other district courts have allowed complaints to survive dismissal when the alleged facts did not show each of the six *Gartenberg* factors. (Pl.'s Resp. 14 (citing *Curran v. Principal Management Corporation, LLC*, 2010 WL 2889752, at *9 (S.D.Iowa June 8, 2010) (stating that "Plaintiffs need not make a conclusive showing of each of the Gartenberg factors but, instead, may state a § 36(b) claim by alleging any combination of facts that plausibly support an inference that a particular fee, given all of the surrounding facts and circumstances, is disproportionately large to the services rendered in exchange for that fee"), *In re Goldman Sachs Mut. Funds Fee Litig.*, 2006 WL 126772, at *9 (S.D.N.Y. Jan. 17, 2006), *Wicks v. Putnam Inv. Mgmt., LLC*, 2005 WL 705360, at *4 (D. Mass. Mar. 28, 2005))). Those cases allowed complaints to survive motions to dismiss, so long as the totality of the alleged facts gave rise to an inference that a particular fee was disproportionately large. *See, e.g., Curran,* 2010 WL 2889752, at *9. This is consistent with the Seventh Circuit's pleading standard that requires district courts to make "all possible inferences from the allegations in favor of the plaintiff." *AnchorBank*, 649 F.3d at 614 (citing *Wilson v. Price*, 624 F.3d 389, 391 (7th Cir. 2010)).

Given such consistency and the fact that all three cases specifically construe the *Gartenberg* factors, the Court is justified in adopting those cases' approach in deciding this motion to dismiss Reso's Section 36(b) claim. *See Curran v. Principal Management Corporation, LLC*, 2010 WL 2889752, at *9 (decided after the Supreme Court's decision in *Jones*), *In re Goldman Sachs Mut. Funds Fee Litig.*, 2006 WL 126772, at *9 (decided prior to the *Jones* decision, but in a Second Circuit district court, which applied the Second Circuit's *Gartenberg* decision, which the Supreme Court later adopted in *Jones*), *Wicks v. Putnam Inv. Mgmt., LLC*, 2005 WL 705360, at *4 (same).

Thus, the Court will deny Artisan's motion to dismiss even if Reso has failed to allege certain of the *Gartenberg* factors, so long as Reso's complaint, taken as a whole, alleges facts that demonstrate a plausible claim for relief under Section 36(b). In its analysis, the Court will look to each of the *Gartenberg* factors, but will not dismiss the case for failure to allege facts that would satisfy certain of the factors. Rather, as mentioned, the Court will look to the totality of the facts alleged in Reso's complaint, viewed through the lens of *Gartenberg*, to determine whether he has stated a plausible claim for relief under Section 36(b).

### 3.2.1 Independence, Care and Conscientiousness of the Funds' Directors in Approving Advisory Agreements

This factor of the *Gartenberg* test may be difficult to satisfy without discovery into the directors' process of approving advisory agreements. Additionally, proving the care and conscientiousness of the directors may require somewhat circular logic: establishing lack of care and conscientiousness through proving the negative effects of agreements entered by the directors.

### 3.2.1.1 Independence

Given such evidentiary difficulties, the Court finds that Reso has alleged facts that sufficiently establish a lack of independence. Artisan argues that Reso lacks information about the board's fee-setting process, and then goes further to list the qualifications of the board members. (Def.'s Reply 5, Def.'s Br. in Supp. 24–25). Despite any lack of information, Reso has offered several specific actions, which he alleges as demonstrations of the lack of independence of the directors. (Compl. ¶¶ 45–47, 49 (including Artisan's failure to provide the directors with "sufficient, complete, and/or accurate information" or meaningful information about economies of scale, while also providing "misleading information to the directors)).

The Court finds those allegations to be specific enough to raise an inference of lack of independence. Even though Artisan has released information publicly relating to that decisionmaking process (*see* Ex. A, att. to Def.' Reply), the Court cannot expect Reso to know or outline the exact contours of the directors' decisionmaking processes. Like many of Reso's allegations, this one slips in by the skin of its teeth: the allegations are threadbare and not well-researched, but are sufficient to satisfy the Court at this stage of the case.

Therefore, the Court finds that Reso has alleged facts that raise an inference that Artisan's directors have not acted independently.

### 3.2.1.2 Care and Conscientiousness

Reso has also alleged facts that raise an inference that Artisan's directors failed to act with care and conscientiousness. As discussed above, Reso has alleged a number of facts that demonstrate that the funds in this case pay a much higher rate than other funds managed by Artisan, and also account for a disproportionately large amount of Artisan's profits, despite

the similar nature of services provided to each by Artisan. (Compl. ¶¶ 33, 75, 82). Taking those facts as true, the Court can infer that the directors did not adequately take into account important facts relating to better rates offered to other Artisan-managed funds.

That inference, which the Court is obliged to make at this stage of the case, *AnchorBank*, 649 F.3d at 614, is appropriate to establish a lack of care and conscientiousness on behalf of Artisan's directors.

### 3.2.2 Nature and Quality of Services

Reso argues that, other than standard investment advising services, Artisan provides only *de minimis* services to the funds at issue in this case. (Pl.'s Resp. 14–15; Compl. ¶¶ 31, 34, 35). In his complaint, Reso sets forth a number of items for which the funds are responsible for paying: custodial transfer agency, legal and accounting services. (Compl. ¶ 34). On the other hand, Artisan is responsible for covering the costs of office space, equipment and management personnel. (Compl. ¶ 34).

Reso also argues that the quality of services provided by Artisan is below par, relying on a Morningstar evaluation of Artisan. (Compl. ¶ 36). Morningstar awarded Artisan an "F" grade for its fees, due to the fact that Artisan's fees rank in the highest 40% of mutual fund fees. (Compl. ¶ 36, Pl. Resp. 15, Def.'s Br. in Supp. 16). While that is true, Morningstar also gave Artisan higher grades in the categories of regulatory issues, board quality, manager incentives, and corporate culture. (Def.'s Br. in Supp. 15).

On this factor, Reso's allegations are somewhat threadbare, but the Court must draw an inference in Reso's favor. *AnchorBank*, 649 F.3d at 614. Reso has alleged that Artisan covers only a small amount of the costs associated with running the mutual fund, and that the mutual fund covers other expenses (Compl. ¶ 34). This allegation has included somewhat specific

information, detailing the relatively high-cost items for which the mutual fund is responsible, including legal and accounting fees. (Compl. ¶ 34). Additionally, while Reso may have only alleged one area—and a rather insignificant area, at that[1]—in which Morningstar determined that Artisan is deficient, Reso's allegations nonetheless raise an inference that the nature and quality of Artisan's services may be viewed as deficient by outside analysts of mutual funds.

For these reasons, the Court finds that Reso's complaint alleges facts that at least raise the inference of deficiency in the nature and quality of services provided by Artisan when compared to the services provided. Therefore, the Court will treat this factor as present for purposes of deciding Artisan's motion to dismiss.

### 3.2.3 Comparative Fee Structures

Reso has alleged facts that demonstrate substantial differences between the fees Artisan charges to the funds in this case and: (1) the fees charged by Artisan to other funds Artisan manages; and (2) the fees charged by other advisers to other fund similar to those in this case. (Compl. ¶¶ 36, 53–63, 66–68). Artisan argues that Reso has "not pleaded facts to make either comparison meaningful." (Def.'s Br. in Supp. 17). The Court disagrees. Reso

---

[1] On this fact, the Court agrees with Artisan that fee comparisons are of little value when discussing the nature and quality of services provided. (*See* Def.'s Br. in Supp. 16 (citing *Amron v. Morgan Stanley Inv. Advisors, Inc.*, 464 F.3d 338, 345 (2d Cir. 2006), *In re Franklin Mut. Funds Fee Litig.*, 478 F. Supp. 2d 677, 686–87 (D. N.J. 2007))). The fees charged by one mutual fund may differ due simply to the nature of services provided, and it is thus not necessarily a meaningful metric by which to measure the nature and value of services offered by an adviser. However, at this motion to dismiss phase, given the relatively low standard of plausibility, such information is sufficient to raise an inference that Artisan's services are viewed as deficient by outside analysts.

has alleged facts that clearly give rise to the inference that Artisan has comparatively over-charged the funds in this case.

### 3.2.3.1 Fees Charged to Other Artisan Clients

Reso has alleged that Artisan charges vastly different amounts to other funds to which it offers management services. (Compl. ¶¶ 53–63). As discussed above, Artisan charges the funds in this case a higher fee rate, with less significant breakpoints, than it charges several other funds it manages. (Compl. ¶¶ 58, 61–62). Additionally, Reso alleges that Artisan receives a vastly disproportionate amount of its income from the funds at issue in this case, in comparison to those funds' respective shares of Reso's total portfolio. (Compl. ¶ 82).

Artisan argues that these differences are of no consequence, because Reso has failed to allege any differences in services between the funds in this case and the funds receiving better rates. (Def.'s Br. in Supp. 19). Reso has alleged that Artisan provides similar services to all the funds it manages (Compl. ¶¶ 35, 55, 57, 58); but, Artisan counters that Reso's allegations are purely speculative, because they were based on "information and belief." (Def.'s Reply 10–11). As discussed above, the Court will not disregard Reso's allegations that were based upon "information and belief."

Accordingly, Reso has alleged substantial differences in fees that are not supported by differences in services provided by Artisan.

### 3.2.3.2 Fees Charged by Other Advisers to Other Funds

Artisan is correct that *Gartenberg* stressed that fee comparisons should be given limited weight by courts considering Section 36(b) claims. (Def.'s Br. in Supp. 16 (citing *Gartenberg*, 694 F.2d at 929)). However, Reso is correct in pointing out that such comparisons should still be considered by Courts. (Pl.'s Resp. 17 (quoting *Gartenberg*, 694 F.2d at 929 ("We do not suggest that

rates charged by other adviser-managers to other similar funds are not to be taken into account.")))

Reso's comparisons to the Vanguard funds are of little value. In his complaint, Reso identified several funds operated by Vanguard, all of which have lower expense ratios than the funds in this case. (Compl. ¶¶ 66–68). While the Court can certainly look to comparative differences between funds operated by different managers, the Court agrees with Artisan that extremely limited comparisons—such as the ones offered by Reso—are of little value. (Def.'s Br. in Supp. 20 (citing *In re Scudder Mut. Funds Fee Litig.*, 2007 WL 2325862, at *17 (S.D.N.Y. Aug. 14, 2007)), Def.'s Reply 12 (citing *Kalish v. Franklin Advisers, Inc.*, 742 F. Supp. 1222, 1230–31 (S.D.N.Y. 1990))). Therefore, the Court places little weight on the comparative fee differences alleged by Reso.

Despite that limited weight, though, the Court finds that Reso's allegations have satisfied the comparative fee structure factor of *Gartenberg*. However weak Reso's comparisons to non-Artisan funds may be, his makes strong comparisons between the funds in this case and other Artisan-operated funds.

Additionally, the Court acknowledges that Reso has alleged facts related to Morningstar's "F" grade for Artisan's fees. The Court realizes that, during discovery, information may become available that would bolster Reso's argument that Artisan's fees are comparatively inappropriate.

### 3.2.4 Economies of Scale

Reso's strongest allegations relate to the economies of scale factor of *Gartenberg*. Based solely on the breakpoints offered to the mutual funds in this case, Reso establishes that Artisan receives economies of scale that it does not pass on to the mutual funds in substantial ways. (Compl. ¶¶ 69–75). In

fact, as discussed above, the mutual funds in this case receive a drop of only ten basis points over the course of reaching nearly $12 billion in assets. (Compl. ¶ 33). At this stage, the Court is also satisfied with Reso's allegations that Artisan provides only *de minimis* non-advisory services.

As such, the Court finds that Reso has alleged facts that establish the economies of scale factor of *Gartenberg*. Reso has alleged facts that sufficiently establish that Artisan's fee is reduced only slightly over the course of amassing a large amount of assets, but that Artisan does not suffer significant additional expenditures over the course of that expansion. Therefore, the Court finds that Artisan is not appropriately passing on those economies of scale to the mutual funds.

### 3.2.5 Profitability of the Fund to the Adviser

Relatedly, as discussed above, the funds in this case account for a larger portion of Artisan's profits than the respective share they account for of Artisan's total managed assets. (Compl. ¶ 82 (alleging that Artisan receives two-thirds of its profits from the funds in this case, while the funds account for only one-half of Artisan's total managed assets)). Again, though, Artisan argues that Reso has failed to adequately allege that such a comparison is valid. (Def.'s Br. in Supp. 23–24, Def.'s Reply 13).

As discussed above, the Court has determined that Reso's allegations are adequate, at this stage of the case, to establish similarity between the ways Artisan operates the funds in this case and other funds.

Therefore, the Court finds that Reso has alleged facts sufficient to show that Artisan reaps too great a benefit from the funds in this case. Thus, the Court finds that the profitability factor of *Gartenberg* is satisfied.

4.	CONCLUSION

In sum, the Court has found that Reso has alleged minimal facts that sufficiently establish each of the *Gartenberg* factors. Accordingly, the Court must deny the Artisan's motion to dismiss because Reso has stated a plausible claim for relief under Section 36(b).

Accordingly,

IT IS ORDERED that defendant's Renewed Motion to Dismiss (Docket #61) be and the same is hereby DENIED.

Dated at Milwaukee, Wisconsin, this 18th day of November, 2011.

BY THE COURT:

J.P. Stadtmueller
U.S. District Judge