# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF WISCONSIN
### MILWAUKEE DIVISION

EDWIN L. RESO, for the use and benefit of
THE ARISAN INTERNATIONAL FUND,
THE ARTISAN INTERNATIONAL VALUE
FUND, and THE ARTISAN MID CAP
VALUE FUND,

          Plaintiff,

    v.

ARTISAN PARTNERS LIMITED
PARTNERSHIP,

          Defendant.

Case No. 2:11-cv-00873-JPS

---

## MEMORANDUM IN SUPPORT OF DEFENDANT ARTISAN PARTNERS LIMITED PARTNERSHIP'S MOTION FOR SUMMARY JUDGMENT

John W. Rotunno (SBN IL/2405342)
john.rotunno@klgates.com
Stephen J. O'Neil (SBN IL /3127564)
stephen.oneil@klgates.com
Paul J. Walsen (SBN IL/6226318)
paul.walsen@klgates.com
Joseph C. Wylie II (SBN IL/6270852)
joseph.wylie@klgates.com
Molly K. McGinley (SBN IL/6285809)
molly.mcginley@klgates.com
K&L GATES LLP
70 West Madison Street, Suite 3100
Chicago, Illinois 60602
Telephone: 312.807.4213
Facsimile: 312.827.8154

Daniel E. Conley (SBN/1009443)
daniel.conley@quarles.com
Joseph O. Wilson (SBN/1052468)
joe.wilson@quarles.com
QUARLES & BRADY LLP
411 East Wisconsin Avenue
Milwaukee, Wisconsin 53202
Telephone: 414.277.5609
Facsimile: 414.978.8609

***Attorneys for Defendant Artisan Partners
Limited Partnership***

# TABLE OF CONTENTS

**Page**

I.  PRELIMINARY STATEMENT ...................................................................................1

II. STATEMENT OF FACTS ......................................................................................4

    A.    The Parties .............................................................................................4

    B.    Regulatory Structure of the Mutual Fund Industry Under the Investment Company Act ..................................................................................5

    C.    The Investment Advisory Agreements and Fee Structures Applicable to APLP Clients ......................................................................5

    D.    Approval of the Investment Advisory Agreements ...............................8

        1.    The APFI Board .......................................................................8

        2.    Materials Provided to the APFI Board ....................................9

        3.    The Board Process ..................................................................11

    E.    Investment Performance and Fees ........................................................12

III. ARGUMENT .....................................................................................................15

    A.    Summary Judgment Standard ...............................................................15

    B.    Plaintiff Bears a Heavy Burden in this Section 36(b) Action ..............15

    C.    There Is No Evidence that the Fees Paid by the Funds Are So Disproportionately Large As to be Outside the Arm's-Length Range .................17

        1.    The Nature and Quality of Services Provided to the Funds .....................18

        2.    Independence, Expertise, Care and Conscientiousness of the Independent Directors.................................................................19

        3.    APLP's Profitability .................................................................21

        4.    Fall-Out Benefits .....................................................................22

        5.    Economies of Scale .................................................................22

        6.    Comparable Fee Structures......................................................26

IV. CONCLUSION ..................................................................................................30

# TABLE OF AUTHORITIES

**Page(s)**

## Cases

*Anderson v. Liberty Lobby, Inc.*,
  477 U.S. 242 (1986) ......................................................................................15

*Benak v. Alliance Capital Mgmt. L.P.*,
  No. Civ. A. 01-5734, 2004 WL 1459249 (D.N.J. Feb. 9, 2004) .......................17

*Calnin v. Hilliard*,
  No. 05-C-694, 2008 WL 336892 (E.D. Wis. Feb. 5, 2008) .............................15

*Celotex Corp. v. Catrett*,
  477 U.S. 317 (1986) ......................................................................................15

*Daubert v. Merrell Dow Pharm., Inc.*,
  509 U.S. 579 (1993) ......................................................................................23

*Gallus v. Ameriprise Fin., Inc.*,
  675 F.3d 1173 (8th Cir. 2012) .......................................................................16

*Gallus v. Ameriprise Fin., Inc.*, 497 F. Supp. 2d 974 (D. Minn. 2007), *rev'd on other
  grounds,* 561 F.3d 816 (8th Cir. 2009), *vacated,* 130 S. Ct. 2340 (2010), *on
  remand,* No. 04-4498, 2010 WL 5137419 (D. Minn. Dec. 10, 2010), *aff'd,* 675
  F.3d 1173 (8th Cir. 2012) ...............................................................18, 25, 28

*Gartenberg v. Merrill Lynch Asset Mgmt., Inc.,*
  694 F.2d 923 (2d Cir. 1982) ....................................................................passim

*In re Am. Mut. Funds Fee Litig.,*
  No. CV 04-5593, 2009 WL 5215755
  (C.D. Cal. Dec. 28, 2009) ....................................................................18, 21, 23

*Jelinek v. Capital Research and Mgmt. Co.*,
  448 Fed. App'x. 716 (9th Cir. 2011) ............................................................19

*Jones v. Harris Assocs. L.P.*,
  No. 04 C 8305, 2007 WL 627640 (N.D. Ill. Feb. 27, 2007),
  *aff'd on other grounds*, 527 F.3d 627 (7th Cir. 2007),
  *vacated and remanded* 130 S. Ct. 1418 (2010) .........................................25, 26

*Jones v. Harris Assocs. L.P.*,
  559 U.S. ___, 130 S. Ct. 1418 (2010) ....................................................passim

Page(s)

*Kalish v. Franklin Advisers, Inc.*,
742 F. Supp. 1222 (S.D.N.Y. 1990), *aff'd,* 928 F.2d 590 (2d Cir. 1991)..................passim

*Krinsk v. Fund Asset Mgmt., Inc.*,
715 F. Supp. 472 (S.D.N.Y. 1988), *aff'd,* 875 F.2d 404 (2d Cir. 1989)..........20, 22, 23, 24

*Meyer v. Oppenheimer Mgmt. Corp.*,
707 F. Supp. 1394 (S.D.N.Y. 1988), *aff'd*, 895 F.2d 861 (2d Cir. 1990)........................22

*Meyer v. Oppenheimer Mgmt. Corp.*,
715 F. Supp. 574 (S.D.N.Y. 1989), *aff'd*, 895 F.2d 861 (2d Cir. 1990)........................30

*Migdal v. Rowe Price-Fleming Int'l, Inc.*,
248 F.3d 321 (4th Cir. 2001) .......................................................................16

*Schuyt v. Rowe Price Prime Reserve Fund Inc.*,
663 F. Supp. 962 (S.D.N.Y.), *aff'd per curiam,* 835 F.2d 45 (2d Cir. 1987).............22, 24

*Strougo v. BEA Assocs.*,
188 F. Supp. 2d 373 (S.D.N.Y. 2002) ...........................................................26

**Statutes**

15 U.S.C. § 80a-1, *et seq.* ...........................................................................4

15 U.S.C. § 80a-10 ...................................................................................5

15 U.S.C. § 80a-15 ...................................................................................5

15 U.S.C. § 80a-2 ....................................................................................5

15 U.S.C. § 80a-35 ...............................................................................passim

C.F.R. § 270.12b-1 ..................................................................................20

**Other Authorities**

SEC Division of Investment Management, Report on Mutual Fund Fees and Expenses,
Dec. 2000 (publicly available at http://www.sec.gov/news/studies/feestudy.htm)...........28

SEC Form ADV (http://www.sec.gov/answers/formadv.htm)....................................10

**Rules**

Fed. R. Civ. P. 56(a) ................................................................................15

Defendant Artisan Partners Limited Partnership ("APLP"), by its undersigned counsel, respectfully submits this Memorandum in support of its Motion for Summary Judgment.

## I.     PRELIMINARY STATEMENT

Section 36(b) of the Investment Company Act of 1940 (the "ICA"), 15 U.S.C. § 80a-35(b), authorizes a shareholder in a mutual fund to bring suit against an investment adviser to recover "excessive" fees charged by the adviser. The stringent standard against which "excessiveness" is measured was confirmed recently by the United States Supreme Court: a fee is excessive only if the plaintiff establishes that it is "*so disproportionately large* that it bears *no reasonable relationship* to the services rendered and *could not have been* the product of arm's-length bargaining." *Jones v. Harris Assocs. L.P.*, 559 U.S. ___, 130 S. Ct. 1418, 1426 (2010) (emphasis added). Thus, the question such a claim raises is *not* whether an investment advisory fee is "reasonable" by some subjective measure: § 36(b) does not "permit a compensation agreement to be reviewed in court for 'reasonableness,'" nor does it call for "second-guessing of informed board decisions" approving an advisory fee. *Id.* at 1423, 1430  The issue, rather, is whether an advisory fee is so disproportionately large as to be outside the range of what might have been negotiated at arm's-length, taking into account all the circumstances, including the considerations known as the "*Gartenberg* factors." *Id.* at 1425-26

In this case, Plaintiff challenges the fees charged by APLP to manage three high performing Artisan mutual funds in which the Plaintiff owns a small number of shares. But no disputed, material fact would permit a conclusion that the fees paid by those funds were "so disproportionately large" as to bear "no reasonable relationship" to the services rendered by APLP, such that the fees could not fall within the arm's-length range. To the contrary, the three Artisan funds at issue have provided investors with exceptional investment performance, were

consistently ranked among the very best in the mutual fund marketplace, are each served by portfolio managers who received top industry recognition as Morningstar Fund Manager of the Year, and paid fees to APLP within the range paid by similar but lower performing mutual funds to their advisers. *Net* of fees, the three funds – Artisan International Fund, Artisan International Value Fund and Artisan Mid-Cap Value Fund (each a "Fund," and together, the "Funds") – were ranked respectively first (#1 out of 44), first (#1 out of 50) and seventh (#7 out of 87) as of June 30, 2012 in total return against their Lipper peer universe over the longest time period used to evaluate performance – the period since inception of the Funds.[1] *See infra*, p. 12-14. In the most recent Morningstar reports, also as of June 30, 2012, these three Funds *each were ranked in the top 1%* of their respective Morningstar Fund Category over the longest applicable performance period (15 years for Artisan International Fund, 5 years for Artisan International Value Fund, and 10 years for Artisan Mid-Cap Value Fund). *Id. In other words, an investor purchasing shares in any one of the Funds at issue would have earned more net of fees than from 99% of other mutual fund investments available in the same asset class during the same time period, even taking into account the fees paid.*

While performance statistics over different time periods or measured against different benchmarks necessarily will vary, there can be no genuine factual dispute that APLP has delivered consistent, exceptional performance to the shareholders of the three Funds. Fees that compare favorably to fees charged by other actively managed funds with similar investment strategies cannot be objectively unreasonable. And competitive fees that produce manifestly *superior* investment performance cannot be "so disproportionately large" that they bear "no reasonable relationship to the services rendered."

---

[1]     Lipper, Inc. and Morningstar, Inc. are two widely recognized third-party sources of

Against the compelling evidence that APLP's fees are well within the arm's-length range, APLP expects that Plaintiff will rely principally on arguments invoking two of the six *Gartenberg* factors, arguments that can be made against virtually any mutual fund adviser at any time, regardless of the performance of, or the fees charged by, the specific fund in question. First, Plaintiff likely will argue that APLP has realized economies of scale in managing the Funds that Plaintiff will contend are not adequately shared with Fund shareholders. However, the opinions of Plaintiff's experts on which this argument rests are profoundly flawed, and deficient as a matter of law. They do not show, as the law requires, that APLP enjoyed the benefit of declining per-unit costs as the Funds grew. Instead, they simply and erroneously treat APLP's *profits* earned from its service to the Funds as having resulted from the realization of economies of scale and contend, with no economic or legal support, that more of those profits must be shared with mutual fund shareholders.

Plaintiff's second argument likely will be that APLP, like nearly all investment advisers in the mutual fund industry, is paid more for the services it provides to the Funds at issue than it is paid for services it provides to its large institutional investors, such as pension funds, that maintain separately managed accounts. That difference is not surprising in light of the completely different markets and regulatory settings in which these services are offered, and important differences in the scope of the services performed by APLP for these different clients. It was because of differences like these that the Supreme Court made clear in *Jones* that a comparison of fees paid by mutual funds to fees paid by separate account clients is of no value and should be disregarded where the services provided are significantly different and the products are offered in different markets. 130 S. Ct. at 1429 and n. 8. Moreover, the Supreme

---

mutual fund industry data.

Court has ruled unequivocally that even where it is permissible to consider a disparity in the fees charged to a mutual fund and the fees charged to separate accounts, such evidence, standing alone, is *not* sufficient to withstand a motion for summary judgment in a § 36(b) case. There must be more -- "other evidence that the fee is outside the arm's length range" -- in order to warrant a trial. *Id.* at 1429, n. 8 In this case, there is no such evidence.

In the end, Plaintiff's "excessiveness" claim is an assault on the mutual fund industry generally – not APLP or the fees it charges to the three Funds at issue. If there are mutual fund advisers charging management fees that are disproportionate to the services they render, the *Jones* standard and common sense dictate that such advisers would be found among those that manage funds with *high* fees and *poor* performance, not an adviser like APLP that has delivered exceptional performance to its shareholders at a price well within the range of peer funds. Plaintiff cannot adduce evidence sufficient to meet the *Jones* standard for § 36(b) liability, and summary judgment therefore should be granted as a matter of law.

## II. <u>STATEMENT OF FACTS</u>

### A. The Parties

Edwin Reso ("Plaintiff") purports to bring this action on behalf of Artisan International Fund, Artisan International Value Fund, and Artisan Mid Cap Value Fund. (Defendant's Statement of Undisputed Facts ("SUF") ¶ 7) Each Fund is a series of Artisan Partners Funds, Inc. ("APFI"), an investment company incorporated under Wisconsin law, headquartered in Milwaukee, and registered under the ICA, 15 U.S.C. § 80a-1, *et seq.* (*Id.* ¶¶ 8, 10) APLP is the investment adviser to each Fund, as well as nine other mutual funds that also are series of APFI (collectively, the "Artisan Funds"). (*Id.* ¶ 8) Each of the three Funds at issue offers two classes of shares: Institutional Shares, which require a minimum investment of $1 million, and Investor Shares, which require a minimum investment of $1,000. (*Id.* ¶¶ 11, 15, 17)

Plaintiff made a $1,000 investment in Investor Class Shares of each of the Funds at issue in 2005. (SUF ¶ 4) He selected the Funds because they were recommended by a financial journal to which he subscribes. *(Id.)* Two years later, he invested an additional $5,000 in each of the Artisan International Fund and the Artisan International Value Fund. (*Id.* ¶ 6)

## B. Regulatory Structure of the Mutual Fund Industry Under the Investment Company Act

The ICA and regulations thereunder establish certain operational, recordkeeping and disclosure requirements for mutual funds and govern the relationship between a mutual fund and its investment adviser. One particularly important requirement of the ICA is that mutual funds have a board of directors, at least 40% of whom must be independent, *i.e.* not interested persons within the meaning of §§ 2(a)(19) and 10(a) of the ICA. 15 U.S.C. §§ 80a-2(a)(19), 80a-10(a). In addition, the Securities and Exchange Commission (the "SEC") requires that at least 75% of a mutual fund's board must be independent in order for the mutual fund to avail itself of certain exemptions from regulations promulgated under the ICA. 17 C.F.R. 270.0-1(a)(7). At all relevant times, the APFI Board exceeded these independence requirements. (SUF ¶¶ 56-57, 64)

## C. The Investment Advisory Agreements and Fee Structures Applicable to APLP Clients

APLP serves as investment adviser to each of the Funds at issue under separate agreements between APLP and APFI (the "Advisory Agreements" or "Agreements"). (SUF ¶ 25) Under the ICA, the continuation of an investment advisory agreement between a mutual fund and its investment adviser must be approved annually by majority of the independent directors of the mutual fund, and a majority of the directors comprising the full board. 15 U.S.C. § 80a-15(a), (c). In connection with that approval, the ICA requires that fund directors request and evaluate, and that the mutual fund's adviser supply, information "reasonably . . . necessary" to evaluate the terms of the agreement. 15 U.S.C. § 80a-15(c).

APLP not only manages the Funds' investment portfolios, but provides an extensive array of other, non-portfolio management services necessary to the operation of APFI and the Artisan Funds, including administrative, legal, accounting and shareholder services. (SUF ¶ 27) Most of these additional services are not required by, and are not provided to, APLP's separate account clients, as described more fully below. (*Id.* ¶¶ 29-31)

In exchange for its services, APLP receives from each Fund a management fee that is a percentage of the Fund's average daily assets and is paid monthly, at the following annual rates:

| *Fund* | *Annual Management Fee Rate* |
|---|---|
| Artisan International Fund | 1.000% on assets up to $500 million<br>0.975% on assets of $500 million up to $750 million<br>0.950% on assets of $750 million up to $1 billion<br>0.925% on assets of $1 billion up to $12 billion<br>0.900% on assets over $12 billion |
| Artisan International Value Fund<br>and<br>Artisan Mid Cap Value Fund | 1.000% on assets up to $500 million<br>0.975% on assets of $500 million up to $750 million<br>0.950% on assets of $750 million up to $1 billion<br>0.925% on assets over $1 billion |

(SUF ¶¶ 45, 47-48) Although most of the Artisan Funds offer two classes of shares (Institutional and Investor), each is a single fund, with a single portfolio of assets and a single management fee schedule. (*Id.* ¶ 14) Thus, the generally small investors in Investor Shares (like Mr. Reso) *pay the same management fee* as the larger and generally more sophisticated investors in Institutional Shares, which carry a minimum $1 million investment requirement. (*Id.* ¶¶ 14-17, 20) For those at-issue Funds that have had an Institutional Share class for an extended period of time (which is true of both Artisan International Fund and Artisan International Value Fund), over 25% of the total assets of each Fund is held in the Institutional Share class. (*Id.* ¶ 18)

For separate account clients in APLP's non-U.S. growth strategy (in which Artisan International Fund is managed), APLP's standard investment advisory fee is 0.80% of the first

$50 million in assets under management and 0.60% of assets in excess of $50 million. (SUF ¶ 80) For clients in APLP's non-U.S. value and U.S. mid-cap value strategies (in which, respectively, Artisan International Value Fund and Artisan Mid Cap Value Fund are managed), APLP's standard investment advisory fee is 0.80% of the first $50 million in assets under management, 0.60% of assets in excess of $50 million and up to $100 million, and 0.50% of assets over $100 million. (*Id.*) ██████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████

The services provided by APLP to its separate account clients are different from, and much more limited than, the comprehensive management services provided by APLP to APFI and the Artisan Funds. (SUF ¶¶ 29-31) Services that APLP provides to APFI and the Artisan Funds that are included in the management fee paid by the Artisan Funds but which are not provided to separate account clients include, but are not limited to:

- preparing the Artisan Funds' regulatory filings, which include the registration statement, statutory and summary prospectuses and statements of additional information, reports to shareholders, and semiannual reports to the SEC; preparing (or supervising the preparation of) materials for APFI Board meetings and maintaining Board calendars;

- providing personnel to serve as officers of APFI and as members of APFI's valuation committee, who perform the functions those positions require;

- managing the Funds' relations with regulators, including responding to regulatory requests and handling regulatory examinations or investigations;

- supervising and reviewing tasks performed by APFI's accounting agent, transfer agent, custodian, and other third-party service providers;

- providing an array of services to financial advisers and other intermediaries through which investors may purchase and hold shares in Artisan Funds, and providing ongoing shareholder servicing to institutional investors who own shares in Artisan Funds; and

- reviewing and evaluating pricing services, calculation and maintenance of expense accruals, calculation of dividends and capital gain distributions, monitoring compliance with Internal Revenue Code Subchapter M, supervision and review of tax return preparation, preparation of financial statements, and coordination of the audit of APFI's financial statements. (*Id.* ¶ 31)

D.    **Approval of the Investment Advisory Agreements**

1.    ***The APFI Board***

APFI and the Artisan Funds are overseen by a Board of Directors (the "APFI Board" or the "Board").  (SUF ¶ 55)  At the time the Agreements were approved in November 2009 and November 2010,[2] the APFI Board was comprised of six directors: David Erne, Thomas Hefty, Jeffrey Joerres, Patrick Pittard, Howard Witt, and Andrew Ziegler.  (*Id.* ¶ 56)  Other than Mr. Joerres (who left the Board in June 2011), the same individuals were the directors of APFI when the Agreements were approved in November 2011.  (*Id.* ¶ 57)  With the exception of Mr. Ziegler, none of the directors is affiliated with APLP, and thus none is an "interested person" within the meaning of § 2(a)(19) of the ICA.  (*Id.* ¶ 64)  Messrs. Erne, Hefty, Joerres, Pittard, and Witt are, in other words, each independent directors of APFI (the "Independent Directors").

The APFI Board is comprised of highly qualified and experienced individuals with distinguished business careers. (SUF ¶¶ 58-63)  Each of the Independent Directors has at least one degree in economics or business administration.  (*Id.*)  Two of the Independent Directors, Messrs. Erne and Hefty, are attorneys.  (*Id.* ¶¶ 58-59)  Four of the five current or former Independent Directors (Messrs. Hefty, Joerres, Pittard, and Witt) have served as Chief Executive Officers of publicly-held companies.  (*Id.* ¶¶ 59-62)  Four of the five Independent Directors have served as chairmen of public-company boards.  (*Id.* ¶¶ 58-63)  The Independent Directors also

---

[2]    The Complaint in this action was filed on June 24, 2011.  Under § 36(b)(3) of the ICA, a claim for damages is limited to the one-year period prior to the date of the commencement of an action.  15 U.S.C. § 80a-35(b)(3).  Accordingly, the period relevant to this case begins on June 24, 2010.  As described *infra*, the APFI Board approved continuation of the Agreements in November 2009 and 2010 for successive one-year periods that include each of the months within the one year pre-filing period relevant to this case.  In November 2011, the Board approved the continuation of the Agreements for an additional one-year period.

bring a wealth of other experience to the Board, including government service, service on private foundation boards, and service as educators. (*Id.* ¶¶ 58-63)

Throughout the relevant period, the Independent Directors of APFI have been represented by experienced members of the investment management practice of the law firm of Ropes & Gray LLP, a firm with extensive, nationally recognized expertise in the representation of mutual funds and their directors or trustees. (SUF ¶¶ 66-67)

### 2. *Materials Provided to the APFI Board*

In approximately September of each year, as part of the annual process of considering renewal of the Agreements, the Independent Directors of APFI, through Ropes & Gray, submit a detailed written request to APLP for information on a variety of subjects. (SUF ¶ 71) Each year, in response to this request, APLP has provided extensive materials concerning these and other topics to the Independent Directors. (*Id.* ¶¶ 72-75) These materials include, but are not limited to, information on the absolute and relative performance of the Artisan Funds; the fees charged and services provided to APFI and the Artisan Funds; the fees charged and services provided to APLP clients other than APFI and Artisan Funds, including separate account clients and mutual funds for which APLP provides subadvisory services; potential conflicts of interest; the allocation of intermediary compensation payments between APFI and APLP; trading, brokerage, and commission recapture, including soft dollar arrangements; and APLP's Form ADV.[3] (*Id.* ¶ 73) APLP also provides the Board with an analysis showing the profitability to APLP of its relationship with each of the Artisan Funds, including an explanation of the manner in which profitability is calculated and the assumptions used to perform the profitability analysis.

---

[3]     The Form ADV is a regulatory filing that contains detailed information concerning an investment adviser's business, ownership, clients, employees, business practices, affiliations, and any disciplinary action taken with respect to the adviser. http://www.sec.gov/answers/formadv.htm).

(*Id.* ¶¶ 74-75)  In addition, each year, APLP provides the Board with a list of services in addition to portfolio management that APLP provides to APFI and the Artisan Funds.  (*Id.* ¶ 73)  APLP also has provided additional information to the APFI Board in response to follow-up requests by the Independent Directors.  (*Id.* ¶¶ 82-85)

The Independent Directors receive extensive additional information prepared by Lipper, Inc. ("Lipper"), a well-recognized independent source of mutual fund data.  (SUF ¶¶ 87-90)  Lipper supplies reports ("Lipper Reports") which compare each Artisan Fund's performance, fees and expenses to other funds independently selected by Lipper.  (*Id.*)  Lipper also provides supplemental reports at APLP's request in circumstances in which APLP believes that a comparison to funds in another Lipper category would be helpful to the Board.  (*Id.* ¶ 91)  The Independent Directors also consider data and ratings from Morningstar, Inc. ("Morningstar"), another well-recognized independent source of mutual fund industry data.  (*Id.* ¶ 95)  In addition to these materials, each year the Independent Directors also received a memorandum from Ropes & Gray advising them as to their duties and responsibilities in connection with the process of reviewing, evaluating and considering approval of the Agreements, and discussing the legal standards governing the contract renewal process, including the *Gartenberg* framework. (*Id.* ¶ 69)

In 2009, 2010, and 2011, as in prior years, the Independent Directors of APFI reviewed and considered the materials provided to them and discussed with representatives of APLP each of the Artisan Funds' operations, the nature, extent and quality of the advisory and other services provided by Artisan Partners to the Artisan Funds, including the performance of the Artisan Funds, the overall expense ratios of each class of shares of the Artisan Funds, and economies of scale and other benefits derived by APLP from its relationship with the Artisan Funds.

(SUF ¶ 111)  In each year, the Independent Directors concluded that the materials they received were thorough and complete, and that no additional information or materials were necessary for them to make their determination.  (*Id*.)

### 3. *The Board Process*

The Independent Directors, guided by the advice of Ropes & Gray, conduct their contract renewal deliberations during two meetings, which generally are held in October and November of each year.  (SUF ¶ 96)  During the October meeting, the APFI Board meets both in full session (in which APLP representatives may be present) and in an executive session, attended only by the Independent Directors and attorneys from Ropes & Gray.  (*Id*. ¶¶ 102, 105, 108) During the October meeting, the Independent Directors review information provided by APLP in response to the written request by Ropes & Gray described above, as well as information provided by Lipper, and ask questions of APLP management concerning the materials or other topics the Directors deem relevant.  (*Id*. 86)

In November the APFI Board meets again, both in full and executive sessions, over a two-day period.  (SUF ¶ 97-99)  In each year relevant to this case, after careful review of the information provided by APLP and Lipper and with the assistance of their counsel, the Independent Directors concluded that the quality of APLP's services was consistently high, with no material deficiencies; that each of the Funds at issue in this case had met its long-term performance standards by adhering to its investment strategy and outperforming its peers over long-term periods; that the costs of the services provided by APLP, and the profits realized by APLP, are reasonable in relation to the nature and quality of the services provided by APLP, in comparison to the fees charged by other peer mutual funds and in comparison to the fees charged and the services offered to other APLP clients, including separate account clients and other mutual funds for which APLP serves as sub-adviser; and that the shareholders of the Funds

benefited appropriately from economies of scale under the fee structures in the Agreements. (*Id.* ¶¶ 86, 111, 113)  In each year, after full consideration, the Independent Directors and the full Board each voted unanimously to continue the Agreements for another year.  (*Id.* ¶ 112)

### E.    Investment Performance and Fees

Information about the fees, expenses and performance of each of the Artisan Funds is available to investors from a variety of sources, including the prospectuses for the Artisan Funds, the Artisan Funds' annual and semi-annual reports, the Artisan Funds' website, various third-party websites, intermediaries, brokers and consultants.  (SUF ¶ 54)

Over any extended period of time, the Funds at issue have generated exceptional investment returns.  (SUF ¶¶ 116-117, 128)  The following comparisons of the Funds at issue to their benchmark indexes or peer groups reflect performance *net of fees*.  (*Id.* ¶ 114)  Because the benchmark indexes do not include expenses that would be paid by shareholders to invest in such an index (and thus have no "fee" component), a fund must outperform a benchmark index by at least the amount of its expense ratio to outperform the benchmark on a "net" basis.

The table below shows the performance reported by Morningstar for each of the Funds at issue for the indicated periods ended June 30, 2012, along with the performance of a commonly used broad-based market index and the performance of the Morningstar category that includes the Fund at issue.  (SUF ¶ 117)  The performance shown for periods longer than one year is the average annual total return achieved over that period.[4]  (*Id.*)

---

[4]    Performance for each of the Funds at issue is for its Investor Shares class (the share class held by Plaintiff); in each case, performance of the Institutional Shares class is slightly better because of that class' slightly lower expense ratio (even though the management fee is the same). The Funds have not been in operation long enough to have a performance record for periods for which performance is not shown.  All index returns are with dividends reinvested.  The MSCI EAFE® Index used by Morningstar is an index designed to measure the equity market performance of developed markets, excluding the U.S. and Canada.  Funds categorized in Morningstar's Foreign Blend category have neither a predominant growth nor value style and

| Fund / Benchmark | Average Annual Total Returns | | | | |
|---|---|---|---|---|---|
| | **1 Year** | **3 years** | **5 Years** | **10 Years** | **15 Years** |
| Artisan International Fund | -3.75% | 10.99% | -2.73% | 5.77% | 7.53% |
| MSCI EAFE® Index | -13.83% | 5.96% | -6.10% | 5.14% | 2.86% |
| Morningstar Foreign Blend Funds | -13.86% | 6.38% | -5.67% | 4.73% | 2.96% |
| Rank in Morningstar Category (%) | 1 | 4 | 14 | 25 | 1 |
| | | | | | |
| Artisan International Value Fund | -6.87% | 12.48% | 0.43% | | |
| MSCI EAFE® Index | -13.83% | 5.96% | -6.10% | | |
| Morningstar Foreign Blend Funds | -13.86% | 6.38% | -5.67% | | |
| Rank in Morningstar Category (%) | 4 | 3 | 1 | | |
| | | | | | |
| Artisan Mid Cap Value Fund | -0.53% | 16.28% | 2.73% | 10.69% | |
| S&P 500 Stock Index | 5.45% | 16.40% | 0.22% | 5.33% | |
| Morningstar Mid Cap Value Funds | -3.42% | 16.68% | -0.64% | 6.76% | |
| Rank in Morningstar Category (%) | 20 | 60 | 5 | 1 | |

Recent Lipper data shows equally strong performance. For the period since its inception

(indicated), each of the Funds was ranked by Lipper as shown in the table below:

| Fund *(Inception Date)* | Rank | # Funds | Lipper Category |
|---|---|---|---|
| Artisan International Fund<br>*(December 28, 1995)* | 1st | 44 | International Large Cap Growth Funds |
| Artisan International Value Fund<br>*(September 23, 2002)* | 1st | 50 | International Multi-Cap Value Funds |
| Artisan Mid Cap Value Fund<br>*(March 28, 2001)* | 7th | 87 | Multi-Cap Value Funds |

(SUF ¶ 116) The performance of each of the Funds at issue against various benchmarks also is

shown on the Artisan Funds website. (*Id.* ¶¶ 124-128) Schmitt Decl. Ex. 1-3.

---

invest primarily in non-U.S. companies with market capitalizations in the top 70% of each economically integrated market. Funds in Morningstar's Mid Cap Value category have a predominantly value style and invest primarily in medium-sized U.S. companies. (See http://corporate.Morningstar.com/US/documents/MethodologyDocuments/MethodologyPapers/ MorningstarCategory Classifications.pdf)

Although the expense ratio[5] of each Fund is factored into the performance numbers reported by Morningstar and Lipper, both also present data on expenses in isolation from net performance. According to the most recent Morningstar data, the 2011 expense ratio for each of the Funds was *below* the Morningstar category average. (SUF ¶¶ 118, 120, 122) In the Lipper materials provided to the APFI Board, the 2011 expense ratio for Artisan International Fund was 1.23%, compared with a 1.18% median for the International Large Cap Growth category and 1.32% for the International Multi-Cap Growth category. (*Id.* ¶ 93) Artisan International Value Fund had an expense ratio of 1.21% in 2011, compared with a median of 1.25% in the combined International Multi-Cap Value and International Multi-Cap growth categories. (*Id.*) Artisan Mid-Cap Value had an expense ratio of 1.21% in 2011, compared with a median of 1.05% in the Multi-Cap Value category and 1.17% in the Mid-Cap Value category. (*Id.*) These expense ratios place the Funds at issue near the median for their respective Lipper peer universes even without considering their superior performance. (*Id.*)

The Funds at issue consistently have been recognized by objective industry analysts as among the best performers in the mutual fund industry. (SUF ¶¶ 129-135) Among other accolades, the portfolio managers for each of the Funds have received the coveted Morningstar Manager of the Year Award, a highly selective and widely recognized award given once per year to one among the hundreds of portfolio teams in each of three categories (domestic stock fund manager, international stock fund manager, and fixed income managers). (SUF ¶¶ 129-131)

---

[5] Not all mutual fund advisers provide the same services in return for their management fee. However, every fund is required to calculate and publish its "expense ratio," the ratio of all of the ordinary operating expenses, including the management fee the fund pays, to average assets under management. (SUF ¶ 12) Fund expense ratios are used across the industry because

# III.    ARGUMENT

### A.    Summary Judgment Standard

Summary judgment should be granted if "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Rule 56 "mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

A genuine dispute as to material facts exists only when those facts "might affect the outcome of the suit under the governing law . . . ." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). "[A] dispute about a material fact is 'genuine' if a reasonable finder of fact could find in favor of the nonmoving party." *Calnin v. Hilliard*, No. 05-C-694, 2008 WL 336892, at *3 (E.D. Wis. Feb. 5, 2008) (citing *Anderson*, 477 U.S. at 248).

### B.    Plaintiff Bears a Heavy Burden in this Section 36(b) Action

Section 36(b) of the Investment Company Act of 1940 provides, in pertinent part:

> [T]he investment adviser of a registered investment company shall be deemed to have a fiduciary duty with respect to the receipt of compensation for services, or of payments of a material nature, paid by such registered investment company, or by the security holders thereof, to such investment adviser or any affiliated person of such investment adviser.

15 U.S.C. § 80a-35(b).

Cases interpreting and applying § 36(b), including the Supreme Court's 2010 decision in *Jones*, 130 S. Ct. 1418, have set a very high bar for suits claiming that advisory fees are excessive. In *Jones*, the Court for the first time considered the standard applicable to the private

---

they provide an apples-to-apples comparison of the total expenses paid by mutual fund shareholders. (Wylie Decl. Ex. 74 at 33)

right of action under § 36(b) and held that "*to face liability . . . an investment adviser must charge a fee that is so disproportionately large that it bears no reasonable relationship to the services rendered and could not have been the product of arm's length bargaining.*" *Jones*, 130 S. Ct. at 1426 (emphasis added). In so holding, the Court emphasized that in contrast to a common law action for breach of fiduciary duty, the ICA places the burden squarely on the plaintiff to prove "that the fee is outside the range that arm's-length bargaining would produce." *Id.* at 1427.

In endorsing the standard originally set forth in *Gartenberg v. Merrill Lynch Asset Mgmt., Inc.,* 694 F.2d 923 (2d Cir. 1982) (discussed *infra*), the Supreme Court clarified that "'Section 36(b) is sharply focused on the question of whether the fees themselves were excessive.'" *Jones*, 130 S. Ct. at 1430 (quoting *Migdal v. Rowe Price-Fleming Int'l, Inc.*, 248 F.3d 321, 328 (4th Cir. 2001)). Accordingly, and contrary to Plaintiff's allegation in this case that a deficiency in the fee-setting process can give rise to liability under § 36(b) (Compl. ¶¶ 25, 26), an investment adviser is subject to liability *only if* fees are deemed excessive by an objective measure: "after *Jones*, a process-based failure alone does not constitute an independent violation of § 36(b)." *Gallus v. Ameriprise Fin., Inc.*, 675 F.3d 1173, 1179 (8th Cir. 2012).

In *Jones*, the Supreme Court also held that the decision of a properly functioning fund board must be afforded great deference by the courts. "[T]he standard for fiduciary breach under § 36(b) does not call for judicial second-guessing of informed board decisions." *Jones*, 130 S. Ct. at 1430. Therefore, "if the disinterested directors considered the relevant factors, their decision to approve a particular fee agreement is entitled to considerable weight, even if a court might weigh the factors differently." *Id.* at 1429. In making this ruling, the Supreme Court recognized that "Congress rejected a 'reasonableness' requirement that was criticized as

charging the courts with rate-setting responsibilities. . . . Congress' approach recognizes that courts are not well suited to make such precise calculations." *Id*. at 1430 (citations omitted).

The Court in *Jones* also recognized the continued utility of the non-exclusive list of factors outlined in *Gartenberg* in assessing whether an advisory fee is so disproportionately large that it bears no reasonable relationship to the services rendered and could not have been the product of arm's-length bargaining. Those factors are: (1) the nature and quality of the services provided to the fund and its shareholders; (2) the profitability to the adviser of its relationship with the fund; (3) "fall-out" benefits to the adviser, *i.e.*, collateral benefits accruing to the adviser because of its relationship with the fund; (4) whether economies of scale are achieved and appropriately shared with fund investors; (5) comparative fee structures; and (6) the independence, expertise, and conscientiousness of the disinterested members of the board in evaluating the advisory fee. *Gartenberg*, 694 F.2d at 929-32. A plaintiff cannot establish liability based on a single factor. *Benak v. Alliance Capital Mgmt. L.P.*, No. Civ. A. 01-5734, 2004 WL 1459249, at *9 (D.N.J. Feb. 9, 2004) ("[p]laintiff has not pointed to a single case where allegations of excessive fees were sustained on the basis of only one of the six factors").

### C. There Is No Evidence that the Fees Paid by the Funds Are So Disproportionately Large As to be Outside the Arm's-Length Range

On the record in this case, it is inconceivable that the management fee paid to APLP by the Funds at issue could be deemed to be "so disproportionately large that it bears no reasonable relationship to the services rendered" such that it "could not have been the product of arm's-length bargaining." *Jones*, 130 S. Ct. at 1429-30. APLP has delivered superior performance for each of the Funds, and has done so at management fees that compare favorably with mutual funds that cannot match that performance. Given these incontrovertible facts, the Court need not sort through expert testimony on issues far less central to the § 36(b) analysis. Nevertheless, a

point-by-point application of the *Gartenberg* factors to the facts of record corroborates and confirms the conclusion that the stringent requirements of § 36(b) are not met.

1. ***The Nature and Quality of Services Provided to the Funds***

The logical starting point for any analysis of whether a mutual fund's fees are disproportionate to the services rendered is the first *Gartenberg* factor – the nature and quality of the services rendered. For reasons that are now likely apparent, Plaintiff has essentially ignored this most critical factor in his Complaint and in his expert reports.[6] In considering the nature and quality of services provided to mutual funds, courts look predominantly to the investment performance of the funds at issue compared to peer funds. "Given investors' primary objective of making money, the most significant indication of the quality of an investment adviser's services is the fund's performance relative to other funds of the same kind." *Kalish v. Franklin Advisers, Inc.*, 742 F. Supp. 1222, 1229 (S.D.N.Y. 1990), *aff'd,* 928 F.2d 590 (2d Cir. 1991); *see also Gallus v. Ameriprise Fin., Inc.*, 497 F. Supp. 2d 974, 977 (D. Minn. 2007), *rev'd on other grounds,* 561 F.3d 816 (8th Cir. 2009), *vacated*, 130 S. Ct. 2340 (2010), *on remand*, No. 04-4498, 2010 WL 5137419 (D. Minn. Dec. 10, 2010), *aff'd*, 675 F.3d 1173 (8th Cir. 2012).

The district court in *Gallus* relied upon Lipper performance data in granting summary judgment, notwithstanding the plaintiff's proffer of testimony from Dr. Pomerantz (also retained by Plaintiff in this case) who claimed that the performance of the funds at issue was "poor." *See Gallus*, 497 F. Supp. 2d at 977, 980-81. Importantly, "the short-term performance of a mutual fund generally is not a good indicator of a fund's overall performance . . . ." *In re Am. Mut. Funds Fee Litig.*, No. CV 04-5593, 2009 WL 5215755, at *48-49 (C.D. Cal. Dec. 28, 2009),

---

[6]     Plaintiff's experts made no mention of comparative performance until rebuttal, and at that time offered only a limited critique of the comprehensive performance analysis conducted by APLP's expert, Dr. Russell Wermers. (Wylie Decl. Ex. 74)

*aff'd sub nom., Jelinek v. Capital Research and Mgmt. Co.*, 448 Fed. App'x. 716 (9th Cir. 2011) (noting the "good to excellent" fund performance over five-year, ten-year, and "lifetime" periods, and holding that plaintiff had "failed to offer any evidence undermining the conclusion that [the adviser's] investment advisory services were anything other than high quality"). Here, the long-term performance of the Funds at issue is nothing short of extraordinary, and even the shorter term results are, for the most part, exceptional.

### 2. *Independence, Expertise, Care and Conscientiousness of the Independent Directors*

Under the ICA, "approval by the board of directors . . . shall be given such consideration by the court as is deemed appropriate under all the circumstances." 15 U.S.C. § 80a-35(b)(2). The Supreme Court has explained that in actions under § 36(b), "[w]here a board's process for negotiating and reviewing investment adviser compensation is robust, a reviewing court should afford commensurate deference to the outcome of the bargaining process . . . . Thus, if the disinterested directors considered the relevant factors, their decision to approve a particular fee agreement is entitled to considerable weight, even if a court might weigh the factors differently." *Jones*, 130 S. Ct. at 1429.

In this case, the Independent Directors are well-qualified, experienced, successful professionals and businessmen who considered the relevant factors in exercising their business judgment to approve the fees in question. (*See* SUF ¶¶ 56-62, 86, 111-113) Even Plaintiff has agreed that the Independent Directors were not "interested" as that term is defined in the ICA. (Compl. ¶ 13 & note 2)

The process by which the Independent Directors approved the Advisory Agreements was robust. "An important element of the independent director's informed state is the advice they received from their independent counsel." *Kalish*, 742 F. Supp. at 1242. Here, experienced

independent counsel from Ropes & Gray advised the Independent Directors in detail as to their obligations under Section 15(c). (SUF ¶¶ 66-69, 111) With the assistance of their independent counsel, the Independent Directors requested, received and evaluated an extensive array of information addressing each of the *Gartenberg* factors, as well as additional material that the Board deemed relevant. (SUF ¶¶ 70-95, 111, 113) The full collection of Section 15(c) materials considered by the Board for the years in question appears at Wylie Decl. Ex. 24-35.

The materials considered by the Independent Directors in this case are at least as thorough as those deemed sufficient in other Section 36(b) cases. In *Kalish*, the board received "financial statements of [adviser] entities, performance comparisons with other funds, and statements of fund expenses and expense ratios." *Kalish*, 742 F. Supp. at 1243. In *Krinsk v. Fund Asset Mgmt., Inc.*, 715 F. Supp. 472 (S.D.N.Y. 1988), *aff'd,* 875 F.2d 404 (2d Cir. 1989), the Board considered information on "the Fund's performance and expense ratios, its portfolio structure and trading activities, the 12b-1 plan,[7] including its impact on expense ratio, total income and yield, as well as comparative information on other funds" and "presentations on such topics as Fund portfolio management, financial consultant reactions to the 12-1 plan, and profitability studies." 715 F. Supp. at 502.

Here, the Independent Directors concluded that the materials provided were "thorough and complete," and that no additional materials were necessary to their decision. (SUF ¶ 111) Where the Independent Directors determined that additional information from APLP would assist them in their review of the Agreements, they requested and received such information. (*Id.* ¶¶ 82-86, 100) After a review of all of the material obtained from APLP bearing upon the

---

[7] A 12b-1 plan is a plan adopted pursuant to Rule 12b-1 under the ICA, 17 C.F.R. § 270.12b-1, pursuant to which a fund may use fund assets to pay certain expenses incurred in

*Gartenberg* factors and other relevant considerations, including comparative performance and fee information prepared by Lipper, and following numerous discussions of that material at meetings (both in open session and in executive session with Ropes & Gray) taking place over the course of three days in October and November of each year, the Independent Directors approved the Agreements. (*Id.* ¶¶ 70-95, 113)

Against the overwhelming evidence establishing the robust nature of Artisan Funds' contract process and the completeness of the information considered by the Board, Plaintiff cannot point to any evidence warranting less then full deference to the Board's process. The Court therefore should decline Plaintiff's invitation to engage in the type of "judicial second-guessing of informed board decisions" that the Supreme Court has found to be unwarranted under § 36(b). *Jones*, 130 S. Ct. at 1430.[8]

### 3. *APLP's Profitability*

APLP's profitability falls well within a range that has been found not to raise § 36(b) concerns in other cases. ███████████████████████████████████████

███████████████████████████████████████████ Other courts have found pre-tax profit margins of up to 89% to be acceptable under § 36(b). *See In re Am. Mut. Funds*, 2009

---

connection with the distribution of fund shares. The Funds do not have 12b-1 plans, and thus the Funds, unlike many other funds, do not pay Rule 12b-1 fees. (SUF ¶ 51)

[8]      In an attempt to diminish the degree of deference to which the Board's decision is entitled, Plaintiff may rely upon the "expert" report of James Lamb (the "Lamb Report"), opining that the profitability analyses presented to the Independent Directors were "rudimentary" and lacked "meaningful information," and that APLP's "fund profitability reporting is deficient." (Wylie Decl. Ex. 69 at 14, 35)  But such criticisms of the manner in which profitability is reported are insufficient to create a genuine issue of material fact as to the independence, care and conscientiousness of independent directors. *Gallus*, 497 F. Supp. 2d at 980 (granting summary judgment and observing that plaintiffs "do not point to any authority detailing requirements for the presentation of profitability data").  Moreover, Plaintiff has not even engaged an expert in corporate governance or the § 15(c) process to challenge the Board's diligence in discharging its obligations.

WL 5215755, at *50 (pre-tax margins up to 50%); *Meyer v. Oppenheimer Mgmt. Corp.*, 707 F. Supp. 1394, 1401 (S.D.N.Y. 1988), *aff'd*, 895 F.2d 861 (2d Cir. 1990) (pre-tax margins up to 89%); *Schuyt v. Rowe Price Prime Reserve Fund Inc.*, 663 F. Supp. 962 (S.D.N.Y.), *aff'd per curiam,* 835 F.2d 45 (2d Cir. 1987) (pre-tax margins of up to 77%). Accordingly, this factor also supports entry of summary judgment in favor of APLP.

### 4. *Fall-Out Benefits*

Fall-out benefits (*i.e.*, "collateral benefits that accrue to the adviser because of its relationship with the mutual fund," *Jones*, 130 S. Ct. at 1426 n.5), if any, that APLP may receive do not support a finding that the fees paid by the Funds are outside the arm's-length range. Plaintiff cannot present any evidence with which to challenge the Board's conclusions as to fall-out benefits, did not even plead in the Complaint that APLP received any fall-out benefits, and has adduced no evidence in discovery or in expert opinions regarding this factor.

### 5. *Economies of Scale*

For purposes of Section 36(b), proving economies of scale requires evidence of a reduction in identifiable per-transaction costs as fund assets under management ("AUM") increase. Thus, in order to prove that an adviser achieved economies of scale, Plaintiff must show "that the per unit cost of Fund transactions . . . decreases as the number of units increases." *Krinsk*, 715 F. Supp. at 496 (applying *Gartenberg* factors and granting summary judgment in Section 36(b) case). "Economies of scale do not exist in a vacuum. The concept is meaningful only if increased size of a fund (more shareholders, more assets under management) directly reduces the manager's costs of processing each transaction and servicing each shareholder." *Kalish*, 742 F. Supp. at 1239. Merely showing that the ratio of cost to AUM decreased as AUM increased is not sufficient: "Plaintiffs must 'create a detailed analysis of each element of a transaction surrounding [the Fund], over an extended period of time, over different levels of

activity.'" *In re Am. Mut. Funds*, 2009 WL 5215755, at *51 (*quoting Krinsk*, 715 F. Supp. at 496). Here, Plaintiff has not even attempted to perform such analysis.

 <u>*Plaintiff's Defective Economies of Scale Analyses*</u>. Plaintiff's expert opinions regarding economies of scale have nothing to do with the concept of economies of scale as it has been applied by courts in § 36(b) litigation.[9] Dr. Pomerantz's report does not quantify the effect of reduced per-transaction expenses, and therefore does not establish the amount of economies of scale, if any, experienced by APLP. (Wylie Decl. Ex. 69 at 10-17) Instead, Dr. Pomerantz uses profits as his measure of economies of scale, claiming in his deposition that "profit is the same as the realization of economies of scale." (Wylie Decl. Ex. 47 at 109, 114) As is evident from the fact that profitability and economies of scale are separate *Gartenberg* factors, one is *not* the same as the other. *See Jones*, 130 S. Ct. at 1426, 1426 n. 5 (separately identifying "the extent to which the adviser-manager realizes economies of scale as the fund grows larger" and "the profitability of the fund to the adviser . . . .")

 In addition, Dr. Pomerantz does not limit his analysis to the specific funds at issue, as is required under Section 36(b). *Kalish*, 742 F. Supp. at 1240 (an analysis that "embraces all funds serviced by [the adviser] . . . falls short of analyzing what was actually taking place in respect of [the adviser's] services to the Fund in suit," and holding that plaintiff did not establish existence of economies of scale). A study such as the one performed by Dr. Pomerantz that purports to show declining cost as a function of AUM would be insufficient even if done correctly: "merely because the ratio of fee based expenses to fee based revenues declined at a time when the Fund

---

[9] The expert opinions of Dr. Pomerantz and Mr. Lamb will be the subject of a separate motion that APLP intends to bring under *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579 (1993). In the event that all or part of the expert opinions of Mr. Lamb and Dr. Pomerantz are found inadmissible under *Daubert*, such a finding would afford additional grounds for summary judgment.

size grew . . . does not establish that such a decline was necessarily due to economies of scale." *Krinsk*, 715 F. Supp. at 496; *see also Kalish*, 742 F. Supp. at 1240 (holding that evidence of "declining ratio of expenses to revenues at a time of increasing size" is legally insufficient to demonstrate that fund adviser achieved economies of scale).

Mr. Lamb's analysis is equally simplistic: he starts by subjectively picking a "base year," determines the profits that APLP purportedly achieved for each Fund in its respective base year using assumed costs and profitability for that year (after excluding certain other assumed costs), and then simply deems any profit in any given year in excess of his base year assumed profit to be "economies of scale." (Wylie Decl. Ex. 68 at 11-14) Mr. Lamb admits that his analysis amounts to a measurement of his subjective determination of how much money APLP should be allowed to make: "[t]his approach captures the excess profits above a sustainable, fiscally responsible, operating level." (Wylie Decl. Ex. 68 at 19) Not surprisingly, Mr. Lamb does not have any economic authority for the proposition that "economies of scale" are the same as "excess profits." And his opinion appears to be that APLP "just plain made too much money. That is not an acceptable approach." *Kalish*, 742 F. Supp. at 1237.

*Sharing Economies of Scale.* Breakpoints are commonly cited by courts as one way for mutual funds to participate in any cost savings achieved as a result of economies of scale. *See, e.g.*, *Schuyt*, 663 F. Supp. at 979-80. Each of the Funds has breakpoints at various AUM levels (SUF ¶¶ 46-48), and even Dr. Pomerantz and Mr. Lamb concede that those breakpoints allow the Funds to participate in economies of scale achieved by APLP, if any. (Wylie Decl. Ex. 68 at 23; Ex. 69 at 16-17) ███████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████ (Wylie Decl. Ex. 68 at 22-23, Ex. 69 at 17)  This is a

meaningful sharing of economics of scale even if every dollar of profit is (incorrectly) counted as

such.

Moreover, Plaintiff can offer no evidence that the economies of scale (if any) shared

through breakpoints are less than what might have resulted from arm's-length negotiation.  *See*

*Jones v. Harris Assocs. L.P.*, No. 04 C 8305, 2007 WL 627640, at *9 (N.D. Ill. Feb. 27, 2007),

*aff'd on other grounds*, 527 F.3d 627 (7th Cir. 2007), *vacated and remanded* 130 S. Ct. 1418

(2010) (granting summary judgment on § 36(b) claim to defendant in part because "Plaintiffs do

not provide any evidence of what savings were gained from economies of scale").  Neither Dr.

Pomerantz nor Mr. Lamb opines on the percentage of economies of scale that would have been

shared with the Funds (or, for that matter, with mutual funds generally) through an arm's-length

process.  As in *Gallus I*,

> Plaintiffs do not establish why the existing breakpoints so inadequately shared the
> cost savings, such that the fee schedules could not have been the product of
> arm's-length bargaining.  Plaintiffs' experts do not identify what amount of cost
> savings would have been appropriate, or why the amounts shared fall outside the
> range that could have been negotiated at arm's length.  Accordingly, Plaintiff's
> claims cannot survive summary judgment based on the economies-of-scale factor.

*Gallus I*, 497 F. Supp. 2d at 982 (noting that Dr. Pomerantz calculated that the funds at issue

received $12.7 million of a total of $74 million in economies of scale).

Finally, breakpoints are not the only way that economies of scale can be shared.  *See* SEC

Division of Investment Management, Report on Mutual Fund Fees and Expenses, Dec. 2000

(publicly available at http://www.sec.gov/news/studies/feestudy.htm).  Even if one assumes that

APLP derives some degree of profit from the existence of any purported economies of scale, any

suggestion that APLP has profited excessively from economies of scale is belied by the

undisputed fact that two of the three Funds have been closed to most new inventors. (SUF ¶¶ 22-24) If APLP were more interested in maximizing its profits than in Fund performance, it would allow Fund AUM to grow without constraint. However, rapid growth, while it may increase short-term profitability, also can cause inefficiencies, such as when inflows cannot be deployed without disrupting returns for existing shareholders, or when high asset levels make it difficult to access smaller companies in the market. (Wylie Decl. Ex. 46 at 51) APLP therefore closes funds to new investors rather than run the risk that rapid growth in AUM will hinder the Funds' superior investment performance, even though by doing so, APLP is limiting the fees it earns from managing the Funds. *Id.*

### 6. *Comparable Fee Structures*

Comparing the Funds' fees and costs to other relevant fee structures confirms that the fees paid by the Funds are not so disproportionately large that they bear no reasonable relationship to the services provided. On the contrary, the fees and costs paid by the Funds are well within the range that might result from arm's-length negotiations. "The range extend[s] from a low-end figure below what the institutional clients were paying and a high-end figure beyond the fees that other mutual fund clients paid." *Jones*, 2007 WL 627640, at *8. The performance realized by the Funds also should be taken into account in considering the fees paid because "[s]uperior performance operates to justify a relatively high fee, which in turn increases profitability." *Kalish*, 742 F. Supp. at 1250.

*Peer Mutual Funds.* Not surprisingly, courts in § 36(b) cases have looked to "a comparison of the fees with those paid by similar funds." *Jones*, 130 S. Ct. at 1426 n.5. Courts consistently have ruled in favor of defendants where advisory fees are "within the range of fees and expenses for similar funds." *Strougo v. BEA Assocs.*, 188 F. Supp. 2d 373, 384 (S.D.N.Y. 2002) (granting summary judgment to defendant). As explained at pages 12-14, the Lipper and

Morningstar data show that the fees paid by the Funds are well within the range of fees paid by peer funds selected by those organizations.[10]  (SUF ¶¶ 93-94, 118-123)

Plaintiff may challenge this comparison based upon the Supreme Court's observation in *Jones* that courts should not rely too heavily on comparisons with fees charged by other advisers to other mutual funds because of the possibility that those fees may not be the product of arms-length negotiation.  In this case, however, there is abundant evidence that sophisticated investors are quite willing to pay APLP's standard mutual fund management fee.  Over $4 billion dollars of investments in the Funds are held in Institutional Share classes, which are offered only to clients with a minimum of $1 million to invest.  (SUF ¶¶ 15-18)  For the Institutional Share classes of the International Fund and the Artisan International Value Fund, more than 25% of the AUM is held by Institutional Share class shareholders.  (*Id.* ¶ 18)  (The Mid-Cap Value Fund has had an Institutional Share class for a short time, and consequently has a much lower percentage of AUM held by Institutional Share investors.)  (*Id.* ¶¶ 12-18)  The willingness of these sophisticated investors to pay the very same management fee as investors in the Investor Share class is powerful evidence that APLP's management fees are within the range that could have been set at arm's length.

Finally, APLP has submitted an expert in financial economics who conducted a detailed analysis of comparative fees in reaching his conclusion that the fees at issue were not disproportionately large in light of the nature and quality of the services rendered.  (Wylie Decl.

---

[10]    In his complaint, Plaintiff alleges that Morningstar gave the Artisan International Fund a grade of "F" in the "Fees" component of the Morningstar Stewardship Ratings.  However, a grade of "F" in that category means only that the fund's expense ratio was in the upper 40% of the Fund's Morningstar comparison group.  (Wylie Decl. Ex. 68)  In other words, 40% of all mutual funds in a given Morningstar category will receive an "F" grade on fees.  At the same time, Morningstar reported that the expense ratio of Artisan International Fund was *below* its

Ex. 75 at 31-52)  Plaintiff, on the other hand, has offered no expert analysis comparing the fees of the Funds to mutual fund peers.

*Fees Paid By APLP's Other Clients*.  The Supreme Court has held that § 36(b) does not require mutual fund advisers to charge all clients the same fee, or to make the same profit from each account: "[e]ven if the services provided and fees charged to an independent fund are relevant, courts should be mindful that the Act does not necessarily ensure fee parity between mutual funds and institutional clients contrary to petitioners' contentions."  *Jones*, 130 S. Ct. at 1429.  Courts may give a comparison of fees paid by mutual funds to those paid by an adviser's other clients "the weight that they merit in light of the similarities and differences between the services that the clients in question require, but courts must be wary of inapt comparisons."  *Jones*, 130 S. Ct. at 1428.  In cases where "the services rendered are sufficiently different that a comparison is not probative, the "courts must reject such a comparison."  *Id.*

In this case, there is ample evidence that the services provided to the Funds are sufficiently different from those provided to APLP's separate account clients to make a fee comparison irrelevant or entitled to very little weight under *Jones*.  In *Gallus I*, the court held that the services provided by the adviser to the funds at issue were not comparable to those provided to other clients.  *Gallus I*, 497 F. Supp. 2d at 982-83.  The "additional services" provided to the mutual funds included "additional compliance requirements, such as preparing and distributing prospectuses and other disclosures; oversight of third-party service providers, including the transfer agent and other intermediaries; director support, including director education and the preparation of quarterly materials for board meetings; and cash management."

---

category average (SUF ¶¶ 118-119), meaning that while the expense ratio was above the median, it was below the mean.

*Id.* at 977.  Similarly, as described *supra* at page 7, APLP provides a host of services to the Funds that it does not provide to separate account clients, who have no need for such services.

Further, "a showing of relevance requires courts to assess any disparity in fees in light of the different markets for advisory services."  *Jones*, 130 St.Ct. at 1429 n.8.  Here, APLP's separate accounts and mutual funds are different products that are distributed through different channels to different customer segments.  Investors in mutual funds generally invest smaller amounts with more frequent inflows and outflows of funds (*i.e.*, purchases and redemptions), while separate account clients typically invest large amounts and have a longer persistency. (SUF ¶ 32)  Finally, mutual funds are highly regulated under the ICA, with all that comprehensive government regulation entails, while separately managed accounts are not.

Plaintiff can be expected to argue that the cost of the additional services provided to the mutual funds was *de minimis*, a proposition that is both wrong and irrelevant.  Although Mr. Lamb speculates as to the cost of these services, he does not account in any way for the additional risks associated with the mutual fund industry.  Moreover, the extra services provided by APLP to the Artisan Funds are not readily quantifiable, particularly since granular data of the kind necessary to perform the cost analysis attempted by Mr. Lamb does not exist.  (SUF ¶ 34) Most importantly, this argument devolves into the proposition that mutual fund advisors should be compensated on a cost-plus basis, an approach that has been soundly rejected by Congress and by courts applying § 36(b).  "'[The] investment advisor is entitled to make a profit.  Nothing in [§ 36(b)] is intended to imply otherwise or to suggest that a 'cost-plus' type of contract would be required.'"  *Meyer v. Oppenheimer Mgmt. Corp.*, 715 F. Supp. 574, 577 (S.D.N.Y. 1989), *aff'd*, 895 F.2d 861 (2d Cir. 1990) (*quoting* S. Rep. No. 91-184 at 4902-03 and granting judgment to defendant).

But even if the facts were such that a comparison should be given some weight, merely showing that the Funds pay fees higher than those paid by other APLP clients is not, standing alone, sufficient to establish a genuine issue of material fact:

> Comparisons with fees charged to institutional clients, therefore, will not 'doo[m] [a]ny [f]und to [t]rial.' . . . First, plaintiffs bear the burden in showing that fees are beyond the range of arm's-length bargaining. . . . Second, a showing of relevance requires courts to assess any disparity in fees in light of the different markets for advisory services. ***Only where plaintiffs have shown a large disparity in fees that cannot be explained by the different services in addition to other evidence that the fee is outside the arm's length range will trial be appropriate.***

*Jones*, 130 S. Ct. at 1429 n.8 (citations omitted and emphasis added).

Thus, in order to survive summary judgment, a plaintiff must have "other evidence that the fee is outside the arm's length range" beyond fee comparisons with other clients of the adviser. *Id.* Here, there is no such other evidence. This single factor, standing alone, does not create a dispute sufficient to allow this case to proceed to trial.

## IV.  CONCLUSION

Plaintiff can establish no genuine issue of material fact that the fees paid by the Funds were so disproportionately large that they bore no reasonable relationship to the services rendered, and could not have been the product of arm's-length bargaining. Accordingly, APLP respectfully requests that the Court grant summary judgment in its favor.

Dated:   July 16, 2012

Respectfully submitted,

ARTISAN PARTNERS LIMITED
PARTNERSHIP

By:   /s/ John W. Rotunno
     John W. Rotunno (SBN IL/02405342)
     john.rotunno@klgates.com
     Stephen J. O'Neil (SBN IL/03127564)
     stephen.oneil@klgates.com
     Paul J. Walsen (SBN IL/6226318)
     paul.walsen@klgates.com
     Joseph C. Wylie II (SBN IL/6270852)
     joseph.wylie@klgates.com
     Molly K. McGinley (SBN IL/6285809)
     molly.mcginley@klgates.com
     K&L GATES LLP
     70 West Madison Street, Suite 3100
     Chicago, IL 60602
     Telephone: 312.807.4244
     Facsimile: 312.827.1278

     Daniel E. Conley (SBN/1009443)
     daniel.conley@quarles.com
     Joseph O. Wilson (SBN/1052468)
     joe.wilson@quarles.com
     QUARLES & BRADY LLP
     411 East Wisconsin Avenue
     Milwaukee, Wisconsin 53202
     Telephone: 414.277.5609
     Facsimile: 414.978.8609

     ***Attorneys for Defendant Artisan Partners
     Limited Partnership***

# CERTIFICATE OF SERVICE

The undersigned, an attorney, certifies that on July 16, 2012, he caused the foregoing to be served automatically via CM/ECF on the following counsel of record:

James C. Bradley (SBN SC/16611)
jbradley@rpwb.com
Michael J. Brickman (SBN SC/000874)
mbrickman@rpwb.com
Nina H. Fields (SBN SC/68294)
nfields@rpwb.com
Richardson, Patrick, Westbrook & Brickman, LLC
1017 Chuck Dawley Blvd. (29464)
Post Office Box 1007
Mount Pleasant, South Carolina 29465
Phone: 843-727-6500
Fax: 843-881-6183

Timothy S. Trecek (SBN 1021161)
ttrecek@habush.com
Habush Habush & Rottier SC
777 E. Wisconsin Avenue, Suite 2300
Milwaukee, Wisconsin 53202
Phone: 414-271-0900
Fax: 414-271-6854

Michael D. Woerner (SBN WA/15452)
mwoerner@kellerrohrback.com
Tana Lin (SBN WA/35271)
tlin@kellerrohrback.com
Lynn Lincoln Sarko (SBN 1010823)
lsarko@kellerrohrback.com
Laura R. Gerber (admission pending)
lgerber@kellerrohrback.com
Keller Rohrback, PLC
1201 3rd Avenue, Suite 3200
Seattle, Washington 98101
Phone: 206-623-1900
Fax: 206-623-3384

Guy M. Burns (SBN FL/0160901)
guyb@jpfirm.com
Jonathan S. Coleman (SBN FL/0797480)
jonathanc@jpfirm.com
Johnson, Pope, Bokor, Ruppel & Burns LLP
403 East Madison Street, Suite 400
Tampa, Florida 33602
Phone: 813-225-2500
Fax: 813-223-7118

Diane A Nygaard (admission pending)
diane@nygaardlaw.com
Kenner Schmitt Nygaard, LLC
117 West 20th Street, Suite 201
Kansas City, Missouri 64108
Phone: 816-531-3100
Fax: 816-531-3600

/s/ John W. Rotunno